UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  01/31/2023
```

LEGAL RECOVERY ASSOCIATES LLC,

Plaintiff,

-against-

BRENES LAW GROUP, P.C. and TROY
BRENES,

Defendants.

22-CV-1778 (ER) (BCM)

**OPINION AND ORDER**

**BARBARA MOSES, United States Magistrate Judge.**

Plaintiff Legal Recovery Associates LLC (LRA), a lender, commenced this action in state court on January 28, 2022 against Brenes Law Group, P.C. (BLG), a law firm, and its president and "principal lawyer," Troy Brenes, to enforce two promissory notes, in the aggregate principal amount of $1.6 million (the Notes), executed by BLG and guaranteed by Mr. Brenes. *See* Compl. (Dkt. 1-1) ¶¶ 1, 4-6, 21-28 & Exs. A-C. BLG and Mr. Brenes (collectively the BLG Parties) removed the case to this Court, invoking its diversity jurisdiction (Dkt. 1), and asserted three counterclaims. *See* Answer & Counterclaims (Ans.) (Dkt. 3) at 15-17, ¶¶ 5-16.[1]

The first counterclaim, which runs only against LRA, alleges that LRA breached the covenant of good faith and fair dealing implied into the Notes by, *inter alia*, refusing to disclose the balance owed to LRA or the account information necessary to wire the funds, thus preventing the BLG Parties from paying off the Notes. Ans. at 15-16, ¶¶ 1-4. The second and third counterclaims run against LRA and four additional counterclaim defendants: Lawrence Litigation Group, L.P. (LLG), a law firm "affiliated" with LRA, *see* Ans. & Counterclaims at 12, ¶ 5, and three individuals: Howard R. Berger, an "employee and agent" of LRA; Gregory Goldberg, an "employee and agent" of both LRA and LLG and a partner in LLG; and Gary Podell, an "owner

---

[1] Citations to the Answer and Counterclaims include both page numbers and paragraph numbers because the paragraph numbers periodically restart and repeat.

and investor" in LRA and a partner in LLG. *Id.* at 9-11, ¶¶ 2-5. However, none of the individual counterclaim defendants has been served with process or appeared, and the 90-day period within which service should have been made, *see* Fed. R. Civ. P. 4(m), has long run. Consequently, the only counterclaim defendants now before the Court are LRA and LLG (collectively, the Moving Parties), which have jointly moved to compel arbitration of the second and third counterclaims. (Dkt. 6.) For the reasons that follow, the motion will be granted in part.[2]

## I.  BACKGROUND

### A.  The Agreement

Defendant BLG and counterclaim defendant LLG are both law firms specializing in, among other things, personal injury actions. The firms entered into an Attorney Association Agreement in 2016, amended in 2017 (as amended, the Association Agreement), under which they were to collaboratively pursue certain types of personal injury actions and share the associated costs and fees. Ans. at 12, ¶¶ 1-2; *see also* Podell Decl. (Dkt. 8) ¶¶ 4-5 & Ex. B (Assoc. Ag.). The contract governs, among other things, what kinds of claims the two firms were to pursue jointly,[3]

---

[2] Although the Second Circuit has not yet addressed the issue, a clear consensus has developed among the District Courts within our Circuit that motions to compel arbitration and for the related relief sought here are non-dispositive, and therefore that a Magistrate Judge may decide the motion pursuant to 28 U.S.C. § 636(b)(1)(A) and Fed. R. Civ. P. 72(a) rather than issue a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Fed. R. Civ. P. 72(b). *See, e.g.*, *Kumaran v. Vision Fin. Markets, LLC*, 2022 WL 17540669, at *2 (S.D.N.Y. Dec. 6, 2022); *Chen-Oster v. Goldman, Sachs & Co.*, 449 F. Supp. 3d 216, 227 n.1 (S.D.N.Y. 2020), *objections overruled*, 2021 WL 4199912 (S.D.N.Y. Sept. 15, 2021); *City of Almaty, Kazakhstan v. Sater*, 2019 WL 6681560, at *1 n.1 (S.D.N.Y. Dec. 6, 2019), *objections overruled sub nom. City of Almaty v. Sater*, 2021 WL 4940304 (S.D.N.Y. Oct. 22, 2021); *Marcus v. Collins*, 2016 WL 8201629, at *1 n.1 (S.D.N.Y. Dec. 30, 2016) (collecting cases).

[3] The Association Agreement covers claims "relating to patients injured by hernia mesh, catheter, and inferior vena cava filters ('PRODUCTS') who have qualifying injuries." Assoc. Ag. ¶ 1.

how the "lead trial attorney" (BLG) and the "co-counsel attorney" (LLG) were to divide up client

acquisition and litigation responsibilities and related expenses,[4] and how the fees would be split.[5]

The Association Agreement also contains a broad arbitration clause, providing, in relevant

part:

> Any controversy arising out of or related to this Agreement or the breach thereof
> shall be settled under the law of the District of Columbia without reference or
> regards to any conflict of laws principles, and shall be resolved via arbitration under
> the American Arbitration Action [sic], 9 U.S.C. § 2, in the District of Columbia, in
> accordance with the rules of the American Arbitration Association, and judgment
> entered upon the award rendered may be enforced or appealed by appropriate
> judicial action pursuant to the District of Columbia Code of Civil Procedure. The
> arbitration shall be heard by a single arbitrator, which shall be a person
> unanimously agreed to by the parties, and the dispute shall be heard within thirty
> (30) days following notice by one party that he/she desires that a matter be
> arbitrated.

Assoc. Ag. ¶ 10.

### B.     The Second and Third Counterclaims

The BLG parties allege that BLG was steered to LLG's affiliate LRA to obtain a line of

credit. Ans. at 12, ¶ 5. After an "underwriting process," LRA declined to offer a line of credit, but

agreed to lend money to BLG pursuant to "promissory notes on an as needed basis," *id.* at 12, ¶ 6,

and ultimately loaned the $1.6 million at issue in this action, evidenced by the Notes. *Id.* at 3, ¶¶ 7-

10. The Notes (dated July 8 and September 12, 2019, in the amount of $1.1 million and $500,000,

respectively) are both collateralized, in identical language, by all of BLG's "right, title and interest

---

[4] BLG, as the lead trial attorney, was to file and pursue the lawsuits and make strategic decisions;
LLG, as co-counsel attorney, was to "acquire Clients" through advertising and other methods,
perform various intake functions, including obtaining the clients' signatures on representation
agreements, and then forward their files to the lead trial attorney. Assoc. Ag. ¶ 3. Additionally,
LLG was to "contribute $15,000 a month towards the costs of litigating these joint venture cases"
and 55% of any "common benefit assessment necessary for LEAD TRIAL COUNSEL to assume
a leadership role in the litigations covered by this agreement." Assoc. Ag. ¶ 3(b).

[5] After recovery of their costs and expenses, BLG was to receive 45% of the "gross attorney fee,"
while LLG would keep the remaining 55%. Assoc. Ag. ¶ 6(a)-(b).

in, to and under" "all proceeds, receivables, property, cash and other consideration payable to [BLG] . . . in connection with" what the Notes call the "Case" (defined to mean "all product liability litigations represented by Brenes Law Group, PC"), "whether as a result of Judgment, settlement or otherwise." Compl. Ex. A, at 1; *id.* Ex. B, at 1. The Notes do not contain any arbitration agreement.

On an unspecified date (presumably after the underwriting process had taken place), Berger, Goldberg, and Podell "fraudulently and without BLG's permission obtained lines of credit from another entity based on the value of BLG' s fee interest in its retained cases[.]" Ans. at 13, ¶ 7. The lender, on information and belief, was "Curiam Capital." *Id.* The counterclaim defendants used those lines of credit "to market for cases and refer or co-counsel those cases with other law firms in exchange for a portion of the legal fees." *Id.* at 16, ¶ 7. LLG referred or was "co-counsel on some of these cases." *Id.* at 16, ¶ 9.[6]

On the basis of these factual allegations, the BLG Parties allege in the second counterclaim that LRA and LLG are liable to them in unjust enrichment and should be made to disgorge (i) whatever profit they gained from the cases they were able to litigate (and the fees they were able to generate) as a result of the fraudulently-obtained line of credit, and (ii) whatever interest expense

---

[6] In their brief, the counterclaim plaintiffs expand on these somewhat cryptic allegations, explaining that during the underwriting process at LRA, in 2019, BLG was required to disclose information regarding all of its cases, including not only the cases subject to its Association Agreement with LLG (that is, hernia mesh, catheter, and inferior vena cava filter cases), but also "many" cases that LLG had no "fee interest in" because they were not covered by the Association Agreement. *See* Def. Mem. (Dkt. 20) at 2, 3-4, 7-8. The counterclaim defendants then "used this information without notice or permission of [BLG] to obtain a line of credit from a third party entity" by "fraudulently claiming rights to the value of BLG's fee interest in all of BLG's cases," including its "retained" cases, that is, cases that were excluded from the Association Agreement and thus remained BLG's alone. *Id.* at 2, 4, 8. LRA used that line of credit to "market for cases through various law firms," including LLG, which referred those cases to "other law firms in exchange for a portion of any collected attorney fees." *Id.* at 2, 4.

they saved by "leveraging the value of BLG's cases" to obtain favorable credit terms, expressed as the difference in the interest on the line of credit obtained from Curiam Capital and the interest BLG had to pay to LRA on the Notes. Ans. at 16, ¶ 10. They allege in the third counterclaim that "all counterclaim defendants" (presumably including LLG, though it is not specifically mentioned in this portion of the pleading) committed fraud by "representing to Curiam Capital that they had permission to leverage the attorney fees in the cases represented by BLG" even though, under the Association Agreement, the counterclaim defendants "did not own such interest and did not have the authority to do so." *Id.* at 17, ¶¶ 14-15.

## II.   ANALYSIS

### A.   Legal Standards

The Federal Arbitration Act, 9 U.S.C. § 2 *et seq.*, provides that arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Sections 3 and 4 of the FAA require a district court to stay the litigation of claims subject to an arbitration agreement and to compel the arbitration of those claims upon the application of either party to the agreement. *Id.* §§ 3, 4.

"The Second Circuit has established a two-part test for determining arbitrability of claims not involving federal statutes: (1) whether the parties agreed to arbitrate disputes at all; and (2) whether the dispute at issue comes within the scope of the arbitration agreement." *ACE Cap. Re Overseas Ltd. v. Cent. United Life Ins. Co.*, 307 F.3d 24, 28 (2d Cir. 2002) (*citing Hartford Accident & Indem. Co. v. Swiss Reinsurance Am. Corp.*, 246 F.3d 219, 226 (2d Cir. 2001)); *accord In re Am. Exp. Fin. Advisors Sec. Litig.*, 672 F.3d 113, 128 (2d Cir. 2011); *Filho v. OTG Mgmt., LLC*, 2022 WL 4567498, at *1-2 (S.D.N.Y. Sept. 29, 2022). Both of these questions are "issues for judicial determination, unless the parties clearly and unmistakably provide otherwise." *Am. Exp. Fin. Advisors Sec. Litig.*, 672 F.3d at 130 (cleaned up); *see also Howsam v. Dean Witter*

*Reynolds, Inc.*, 537 U.S. 79, 84 (2002) ("[A] disagreement about whether an arbitration clause in a concededly binding contract applies to a particular type of controversy is for the court."); *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 943-46 (1995) (the court, not the arbitrator, decides whether parties who did not sign the arbitration agreement are nonetheless bound by it). However, "in deciding whether the parties have agreed to submit a particular grievance to arbitration, a court is not to rule on the potential merits of the underlying claims." *AT & T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 649 (1986); *see also Hawkins v. Toussaint Cap. Partners, LLC*, 2010 WL 2158332, at *3 (S.D.N.Y. May 27, 2010) ("courts must refrain from reaching the underlying merits prior to compelling arbitration").

If all of the claims are referred to arbitration, a stay of judicial proceedings is mandatory. *Katz v. Cellco P'ship*, 794 F.3d 341, 347 (2d Cir. 2015); *Hamzaraj v. ABM Janitorial Ne. Inc.*, 2016 WL 3571387, at *5 (S.D.N.Y. June 27, 2016). If some, but not all, claims are subject to arbitration, the court must "sever those claims subject to arbitration from those adjudicable only in court," *Collins & Aikman Prods. Co. v. Bldg. Sys., Inc.*, 58 F.3d 16, 20 (2d Cir. 1995), compel arbitration of the arbitrable claims, and determine "whether to stay the balance of the proceedings pending arbitration." *Begonja v. Vornado Realty Tr.*, 159 F. Supp. 3d 402, 408-9 (S.D.N.Y. 2016) (*citing Guyden v. Aetna, Inc.*, 544 F.3d 376, 382 (2d Cir. 2008)). "That decision is one left to the district court . . . as a matter of its discretion to control its docket." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 20 n.23 (1983).

### B.    The Parties' Positions

The BLG Parties concede that the Association Agreement contains a "broad" arbitration clause, Def. Mem. at 7, but argue that it does not apply to the second and third counterclaims because they "arise from and relate to the loan agreement between BLG and LRA" rather than from the Association Agreement itself. Def. Mem. at 6. The BLG Parties further contend that they

cannot be made to arbitrate with LRA (as opposed to LLG) because "neither BLG [n]or Troy Brenes ever agreed to arbitrate with LRA," which is not a signatory to the Association Agreement. *Id.* at 5.

The Moving Parties, for their part, contend that the second and third counterclaims fall "squarely within the scope of the [arbitration] clause," arguing that the claims would not even exist "but for the existence of that [Association A]greement, the co-counsel relationship that the parties formed under it, and the cases that they obtained together," Pl. Mem. (Dkt. 7) at 5, and will require the fact-finder to determine whether the fee interests that LRA used to obtain third-party funding "were in fact derived from LLG's interests under the Attorney Association Agreement." Pl. Reply Mem. (Dkt. 22) at 2. Thus, in the Moving Parties' view, "litigation of these counterclaims will necessarily turn almost entirely on interpretation of the Attorney Association Agreement." *Id.* However, the Moving Parties do not address the question whether the BLG Parties are required to arbitrate against LRA, which did not sign the Agreement, as well as LLG, which did. And neither side addresses the question whether – if the arbitration clause reaches LLG but not LRA – the second and third counterclaims should nonetheless be stayed as against LRA.

### C. Whether the Second and Third Counterclaims Are Within the Scope of the Arbitration Clause

Where, as here, the parties agree on the existence of a valid arbitration clause but dispute its scope, the burden lies with the party opposing arbitration to demonstrate that the agreement is "inapplicable" to the dispute at hand. *Marcus v. Collins*, 2016 WL 8201629, at *7 (quoting *Sajdlowska v. Guardian Serv. Indus., Inc.*, 2016 WL 7015755, at *4 (S.D.N.Y. Dec. 1, 2016)). And where, as here, the arbitration clause is "broad," (covering "[a]ny controversy arising out of or related to this Agreement," Assoc. Ag. ¶ 10), the burden is a heavy one, because the courts must "resolve any doubts concerning the scope of arbitrable issues 'in favor of arbitrability.'" *Daly v.*

*Citigroup Inc.*, 939 F.3d 415, 421 (2d Cir. 2019) (quoting *State of N.Y. v. Oneida Indian Nation of N.Y.*, 90 F.3d 58, 61 (2d Cir. 1996)); *see also ACE Capital*, 307 F.3d at 28 (any "doubts as to whether a claim falls within the scope of that agreement should be resolved in favor of arbitrability"); *Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading Inc.*, 252 F.3d 218, 224 (2d Cir. 2001) ("Where the arbitration clause is broad, 'there arises a presumption of arbitrability' and arbitration of even a collateral matter will be ordered if the claim alleged 'implicates issues of contract construction or the parties' rights and obligations under it.'") (quoting *Collins & Aikman Prods.*, 58 F.3d at 23).

The BLG Parties have failed to show that the second and third counterclaims fall outside the scope of the broad arbitration clause in the Association Agreement. In considering this question, the Court "look[s] to the conduct alleged," rather than the "characterization" of that conduct in the pleadings, and "determine[s] whether or not that conduct is within the reach of the [relevant] arbitration clause." *Collins & Aikman Prods.*, 58 F.3d at 20. "If the allegations underlying the claims 'touch matters' covered by the [agreements containing arbitration clauses], then those claims must be arbitrated, whatever the legal labels attached to them." *Genesco, Inc. v. T. Kakiuchi & Co.*, 815 F.2d 840, 846 (2d Cir. 1987) (quoting *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 624 n.13 (1985)); *accord Collins & Aikman Prods.*, 58 F.3d at 20. Here, the counterclaims at issue allege that LLG unfairly benefitted from "the value of BLG's fee interest in its retained cases," Ans. at 16-17, ¶¶ 7, 13, that is, the cases that it did *not* share with LLG under the Association Agreement. The dispute thus "arises out of" and "touches" the co-counsel relationship established and bounded by that agreement.

Moreover, the BLG Parties cannot hope to pursue these counterclaims, and the Moving Parties cannot hope to defend against them, without placing the Association Agreement before the

trier of fact for a determination as to whether LLG falsely or unfairly claimed a fee interest in cases to which – under the Agreement – it had no such rights. Since the counterclaims "implicate[ ] issues of contract construction" and "the parties' rights and obligations under [the Association Agreement]," *Louis Dreyfus Negoce*, 252 F.3d at 224, they are subject to its arbitration clause. *See also China Auto Care, LLC v. China Auto Care (Caymans)*, 859 F. Supp. 2d 582, 589 (S.D.N.Y. 2012) (because all of plaintiffs' claims alleged conduct that "degraded or disregarded Plaintiffs' rights under the Shareholder Agreement," which "define[d]" those rights and contained an arbitration clause, "Plaintiffs cannot escape the conclusion that their claims – no matter how they are styled – relate to the Shareholder Agreement and are therefore within the ambit of that contract's broad Arbitration Clause.").

It may well be, as the BLG Parties argue, that the second and third counterclaims also "relate to the loan agreement between BLG and LRA," Def. Mem. at 6, which does not contain an arbitration clause. As the Second Circuit explained in *Collins & Aikman Prods.*, however, when a party pleads conduct that arises out of or relates to two different contracts, one of which has an arbitration clause, that clause must be enforced. 58 F.3d at 21 ("The question is not whether the second and third claims arise under the 1988 Agreement, which has no arbitration clause; the question is whether these claims plead conduct that 'aris[es] out of or [is] related to' the 1977 Contracts, which does have such a clause.") (alteration in original); *see also Euro Pac. Cap. Inc. v. Bohai Pharms. Grp., Inc.*, 2016 WL 297311, at *4 (S.D.N.Y. Jan. 21, 2016) ("Where there are multiple contracts related to the underlying dispute, only some of which contain an arbitration clause, courts commonly find that contractual claims founded upon one agreement may still sufficiently relate to another agreement such that the latter agreement's arbitration clause compels

arbitration of the entire dispute."). The Court therefore concludes that the second and third counterclaims are within the scope of the Association Agreement's arbitration clause.

### D.      Whether Both BLG Parties Must Arbitrate the Second and Third Counterclaims against Both Moving Parties

As noted above, neither Mr. Brenes nor LRA is a "signatory" to the Association Agreement.[7] Since "[a]rbitration is a matter of contract," a party "cannot be required to submit to arbitration any dispute which it has not agreed so to submit." *Ragone v. Atl. Video at Manhattan Center*, 595 F.3d 115, 126 (2d Cir. 2010) (quoting *JLM Indus., Inc. v. Stolt-Nielsen SA*, 387 F.3d 163, 171 (2d Cir. 2004) (cleaned up). Under federal law, however, "the fact that non-signatories did not sign a written arbitration agreement 'does not foreclose the application of the well-established contract and agency principles under which nonsignatories sometimes can be obligated by, or benefit from agreements signed by others.'" *Alghanim v. Alghanim*, 828 F. Supp. 2d 636, 647 (S.D.N.Y. 2011) (quoting *Borsack v. Chalk & Vermilion Fine Arts, Ltd.*, 974 F. Supp. 293, 301 (S.D.N.Y. 1997)).

Under the doctrine of direct benefits estoppel, "[a] nonsignatory may be bound by an arbitration clause when [he] has 'knowingly accepted the benefits of an agreement with an arbitration clause, even without signing the agreement.'" *Robinson Brog Leinwand Greene Genovese & Gluck P.C. v. John M. O'Quinn & Assocs., L.L.P.*, 523 F. App'x 761, 763 (2d Cir. 2013) (summary order) (quoting *MAG Portfolio Consult, GMBH v. Merlin Biomed Grp. LLC*, 268 F.3d 58, 61 (2d Cir. 2001)). Relying on *Robinson Brog* and similar cases, the Moving Parties argue that Mr. Brenes is "equitably estopped from avoiding arbitration," noting that he brought both of the relevant counterclaims "jointly" with BLG, seeking identical relief, Pl. Mem. at 5, thereby

---

[7] Although Mr. Brenes physically signed the Association Agreement, he did so on behalf of BLG, and was not separately identified as a party to the contract. *See* Podell Decl. Ex. B, at 5.

implicitly asserting personal rights to the fees generated by BLG's "retained cases." In their opposition brief, the BLG Parties do not dispute this point, focusing instead on whether either of them can be compelled to arbitrate with non-signatory LRA. Def. Mem. at 5-6. Consequently, Mr. Brenes, along with BLG, must arbitrate the second and third counterclaims.[8]

As to LRA, it is the Moving Parties that have failed to counter the argument, made in the BLG Parties' opposition brief, that neither of the BLG Parties "ever agreed to arbitrate any claim with any entity or persons other than [LLG]." Def. Mem. at 6. Although the record suggests that LRA could have made an equitable estoppel argument on this point as well,[9] the Court will not make that argument on its behalf.[10] Consequently, the BLG Parties will not be compelled to arbitrate against LRA.

---

[8] *See Ramirez v. Temin & Co., Inc.*, 2021 WL 4392303, at *9 (S.D.N.Y. Sept. 24, 2021) ("Numerous courts have held that a [party's] failure to address an issue in its opposition . . . amounts to a concession or waiver of the argument[.]") (collecting cases).

[9] "Non-signatories seeking to compel a signatory to arbitrate a dispute" based on the principle of equitable estoppel must show (1) "that 'the issues the nonsignatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed," and (2) that there is "a relationship among the parties of a nature that justifies a conclusion that the party which agreed to arbitrate with another entity should be estopped from denying an obligation to arbitrate a similar dispute with the adversary which is not a party to the arbitration agreement.'" *Alghanim*, 828 F. Supp. 2d at 648 (quoting *Ragone*, 595 F.3d at 126-27). Here, as shown above, the issues that LRA is seeking to resolve though arbitration are "intertwined" with the Association Agreement, and the counterclaims do not "materially distinguish between signatory defendant [LLG] and non-signatory defendant[ ] [LRA]," *id.*, accusing both of the same misconduct. Further, according to the BLG Parties, LLG (the signatory) is not only "affiliated" with LRA (the non-signatory) through overlapping ownership; it is a "sham law firm" that was "formed" by LRA for marketing and fee-splitting purposes. *See* Ans. at 11-14, ¶¶ 5, 9, 11.

[10] *See Vann v. Persico*, 2022 WL 4368110, at *9 (S.D.N.Y. Sept. 20, 2022) (where defendant's reply brief "notably failed to respond to Plaintiff's arguments in Opposition," defendant "concede[d] the point") (quoting *Cornelius v. Macy's Retail Holdings, Inc.*, 2019 WL 11816537, at *2 (W.D.N.Y. Aug. 5, 2019); *see also Cornelius*, 2019 WL 11816537, at *2 (denying motion to compel arbitration where, among other things, Macy's reply brief failed to respond to plaintiff's argument, made in its opposition brief, that she "did not enter into a binding agreement to arbitrate" because Macy's "voided any such agreement" by refusing to follow the dispute resolution procedures required therein) (collecting cases).

**E.     Whether the Second and Third Counterclaims Should be Stayed as to LRA**

When only a portion of the contested claims are arbitrable, "[t]he decision to stay the balance of the proceedings pending arbitration is a matter largely within the district court's discretion to control its docket." *Genesco, Inc.*, 815 F.2d at 856 (quoting *Moses H. Cone Mem'l Hosp.*, 460 U.S. at 20 n.23). Where "some of the parties are bound by arbitration and some are not, courts routinely stay all proceedings pending the resolution of the arbitration – particularly where the arbitrable and non-arbitrable claims arise out of the same set of facts." *Gem City Mgmt. Inc. v. Rinde*, 2022 WL 4133429, at *6 (S.D.N.Y. Sept. 12, 2022) (collecting cases); *see also Alghanim*, 828 F. Supp. 2d at 664-65 (staying claims asserted against non-signatories to arbitration agreement while same claims, asserted against signatories, were arbitrated).

Here, although the Court will not compel the BLG Parties to arbitrate against LRA, neither will it permit the counterclaim plaintiffs to pursue identical claims for unjust enrichment and fraud against two closely affiliated entities in two different venues at the same time, which would multiply costs and lead to potentially inconsistent results. Conversely, staying the second and third counterclaims as against all counterclaim defendants will promote judicial economy, particularly given that "in the Second Circuit, the doctrine of collateral estoppel has long been applied to arbitrator's decisions." *Alghanim*, 828 F. Supp. 2d at 665 (*citing Goldstein v. Doft*, 236 F. Supp. 730 (S.D.N.Y. 1964), *aff'd*, 353 F.2d 484 (2d Cir. 1965); *see also CBF Indústria de Gusa S/A v. AMCI Holdings, Inc.*, 850 F.3d 58, 77 (2d Cir. 2017) ("It is settled law that the doctrine of issue preclusion is applicable to issues resolved by an earlier arbitration."). Thus, although it is "premature to make any determinations as to the preclusive effect of the . . . arbitration," *Gem City Mgmt.*, 2022 WL 4133429, at *7, in the event that LLG prevails in arbitration, LRA may be able to "defensively deploy" that result "to collaterally estop [the BLG Parties] from re-litigating the same issues in this action." *Alghanim*, 828 F. Supp. 2d at 665.

### III.    CONCLUSION

For the reasons set forth above, it is hereby ORDERED that the motion of counterclaim defendants LRA and LLG to compel arbitration of the second and third counterclaims asserted by BLG and Mr. Brenes and for related relief is GRANTED to the extent that (1) the BLG Parties are hereby COMPELLED to pursue the second and third counterclaims against LLG in arbitration, if at all, and (ii) the second and third counterclaims are hereby STAYED, as against all counterclaim defendants, pending the outcome of the arbitration.[11]

It is further ORDERED that the BLG Parties shall submit a letter regarding the status of the arbitration every three months, with the first submission due on **May 1, 2023**.

It is further ORDERED that, no later than **February 7, 2023**, the BLG Parties shall either dismiss the second and third counterclaims as against Berger, Goldberg, and Podell or show cause, in writing, why those counterclaims should not be dismissed as against the unserved individual counterclaim defendants pursuant to Fed. R. Civ. P. 4(m).

The Clerk of Court is respectfully directed to terminate the motion at Dkt. 6.

Dated:  New York, New York
         January 31, 2023                          **SO ORDERED.**


                                                   _____
                                                   **BARBARA MOSES**
                                                   **United States Magistrate Judge**

---

[11] The stay extends only to the second and third counterclaims.