UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

LEGAL RECOVERY ASSOCIATES LLC,

Plaintiff,

-against-

BRENES LAW GROUP, P.C., et al.,

Defendants.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _02/13/2023_

22-CV-1778 (ER) (BCM)

**REPORT AND RECOMMENDATION
TO THE HON. EDGARDO RAMOS**

**BARBARA MOSES, United States Magistrate Judge.**

Legal Recovery Associates LLC (LRA), a lender, filed this action in state court on January 28, 2022 against a law firm, Brenes Law Group, P.C. (BLG), and its "principal lawyer," Troy Brenes, to enforce two promissory notes in the aggregate principal amount of $1.6 million (the Notes), which were executed by BLG, and a personal guarantee (the Guarantee), which was executed by Mr. Brenes. *See* Compl. (Dkt. 1-1) ¶¶ 1, 4-6, 21-28. BLG and Mr. Brenes (collectively the BLG Parties) removed the case to this Court, invoking its diversity jurisdiction, *see* Not. of Rem. (Dkt. 1) ¶ 4, and filed an answer, nine affirmative defenses, and three counterclaims. *See* Answer and Counterclaims (Ans.) (Dkt. 3) at 15-17, ¶¶ 1-16.[1] The first counterclaim alleges that LRA breached the covenant of good faith and fair dealing implied into the Notes in late 2020 by refusing to disclose the balance owed on the Notes or an account number to which payment could be wired, thus preventing BLG from paying off its debt. Ans. at 15-16, ¶¶ 1-4. The first seven affirmative defenses, which are based on the same factual allegations, assert that LRA's claims are barred or limited on theories ranging from unclean hands to laches. Ans. at 8-9, ¶¶ 1-7. The last two affirmative defenses allege that the Notes violate New York's usury laws and that they were procured through "undue influence and duress." Ans. at 9, ¶¶ 8-9.

---

[1] Citations to the Answer and Counterclaims include both page numbers and paragraph numbers because the paragraph numbers periodically restart and repeat.

Now before me for report and recommendation (*see* Dkt. 21) is LRA's motion (Dkt. 17) to (i) dismiss the first counterclaim, pursuant to Fed. R. Civ. P. 12(b)(6),[2] and (ii) strike all of Mr. Brenes's affirmative defenses pursuant to Fed. R. Civ. P. 12(f). As to the counterclaim, LRA's principal contention is that defendants have not pled facts sufficient to show that BLG was prevented from paying off the Notes. *See* Pl. Mem. (Dkt. 19) at 3-6. Additionally, LRA argues that Mr. Brenes lacks standing to assert a counterclaim for breach of a covenant implied into the Notes because he is not a party to the Notes. *Id.* at 10. LRA further contends that Mr. Brenes is barred from asserting any counterclaim or affirmative defense to LRA's claim on the Guarantee because, in that instrument, he contractually waived all defenses. *Id.* at 6-9. For the reasons that follow, I recommend, respectfully, that the motion be granted in part.

The first counterclaim is adequately pleaded under New York law. Thus, BLG is entitled to discovery concerning LRA's alleged conduct in blocking its ability to pay off the Notes in 2020. Mr. Brenes, however, is not a party to the Notes and therefore cannot assert a counterclaim for LRA's alleged breach of the covenant of good faith and fair dealing implied therein.

Although the Guarantee states that it is "unconditional," and includes a "waiver of defenses" provision – in which Mr. Brenes broadly waived BLG's defenses under the Notes and his own defenses under the Guarantee – his first seven affirmative defenses should not be stricken. These defenses arise from allegedly wrongful conduct by LRA that took place after the Guarantee was signed and allegedly created the conditions that allowed LRA to accelerate Mr. Brenes's liability under that Guarantee. Under New York law, such conduct "may serve to discharge the

---

[2] The second and third counterclaims, which are not directly at issue in this Report and Recommendation, are described in my Opinion and Order dated January 31, 2023 (Op.) (Dkt. 29), which granted, in part, the motion of LRA and its affiliate, counterclaim defendant Lawrence Litigation Group, LLP (LLG), to compel arbitration of those counterclaims. *See* Op. at 3-4, 13.

guarantor's obligation" despite broad waiver language. *Canterbury Realty & Equip. Corp. v. Poughkeepsie Sav. Bank*, 135 A.D.2d 102, 106-07, 524 N.Y.S.2d 531, 534 (3d Dep't 1988).

However, the eighth and ninth affirmative defenses (alleging that the Notes are usurious and were procured through undue influence and duress) should be stricken as to both defendants. The usury defense fails as a matter of New York law. The undue influence defense is wholly conclusory, lacking any concrete factual support. Moreover, the waiver language in the Guarantee is effective to bar Mr. Brenes from asserting defenses based on the validity of the underlying Notes.

## I.    BACKGROUND

### A.    The Parties

Plaintiff and counterclaim defendant LRA is a lender, organized as a New York limited liability company, with its principal place of business in Westbury, New York. Compl. ¶ 4. Defendant BLG is a law firm, organized as a California professional corporation, with an address in Aliso Viejo, California, which specializes in, among other things, personal injury actions. *Id.* ¶¶ 5, 11. Brenes is LRA's "principal lawyer and president," and a resident of Irvine, California. *Id.* ¶ 6.

In their Answer and Counterclaims, the BLG Parties identify three individuals as "employees," "agents," and/or "owners" of LRA: Gregory Goldberg, Gary Podell, and Howard R. Berger, all of whom reside in New York. Ans. at 9-11, ¶¶ 2-4. However, the pleadings do not clearly identify these individuals as *members* of LRA, nor rule out the existence of other members. Counterclaim defendant LLG is alleged to be LRA's "affiliate," *id.* at 12, ¶ 5, and "holds itself out as a limited liability partnership engaged in the practice of law with its primary place of business

in the District of Columbia." *Id.* at 11, ¶ 5. LLG has three partners: Goldberg, Podell, and Tae Shin, who resides in Florida. *Id.* at 11, ¶ 5.[3]

### B.    Facts Alleged in the Complaint

#### 1.    The Promissory Notes

BLG is the maker of two promissory notes, dated July 8 and September 12, 2019, in the principal amounts of $1,100,000 and $500,000, respectively. Compl. ¶ 7; *see also id.* Ex. A (Dkt. 1-1 at ECF pp. 8-11) (Note 1); *id.* Ex. B (Dkt. 1-1 at ECF pp. 13-15) (Note 2) (together, the Notes).[4] Interest on the Notes was to accrue at the annual rate of 17.5%. Notes at 1. In the event of a default, interest would accrue at the annual default rate of 18%. *Id.* The Notes include a footnote (which appears to have been left in inadvertently) advising the drafter to "[c]onsider specifying [the] applicable day-count convention for interest accrual." *Id.* at 1 n.1. The applicable day-count convention is not specified in the Notes.

BLG agreed to pay LRA the principal and accrued interest on the "Payment Date," defined as "the date on which [BLG] receives payment of any award in respect of all product liability litigations represented by [BLG] . . . , whether as a result of judgment, settlement, or otherwise." Notes at 1.[5] The Notes are collateralized by all of BLG's "right, title and interest in, to and under"

---

[3] LLG, Berger, Goldberg, and Podell were named as counterclaim defendants in the second and third counterclaims. However, the three individuals were never served with process and never appeared. *See* Op. at 1-2. The Opinion and Order compelled the BLG Parties to arbitrate the second and third counterclaims as against LLG, and stayed them as against LRA pending the outcome of the arbitration. *See* Op. at 13. On February 9, 2023, the BLG Parties voluntarily dismissed the second and third counterclaims as against Berger, Goldberg, and Podell. (Dkt. 32.)

[4] Because the Notes are identical – but for their dates and the amount promised – they are cited collectively herein except when the context requires otherwise.

[5] Read literally, this language would require BLG to repay the entire principal, with all accrued interest, whenever it received even a small fee award in one of its cases. Although it seems unlikely that this could have been the intent of the parties, the Court need not determine, at present, the meaning of the "Payment Date" provision.

"all proceeds, receivables, property, cash and other consideration payable to [BLG] . . . in connection with" what the Notes call the "Case" (defined to mean "all product liability litigations represented by Brenes Law Group, PC"), whether BLG receives these payments "as a result of judgment, settlement or otherwise." Notes at 1.

In the Notes, BLG represented, warranted, and covenanted that the collateral would be "free and clear of any lien, security interest, option, or other charge or encumbrance except those . . . created by [each] Note." Notes at 2. Furthermore, BLG agreed to "take all steps necessary to perfect and evidence the perfection of the first-priority security interest granted," Notes at 1, and authorized LRA to file a UCC financing statement "naming [BLG] as debtor and [LRA] as secured party and describing the Collateral." *Id.* It is not clear whether LRA filed such a financing statement.

The Notes contain a prepayment clause, permitting BLG to prepay them "either in whole or in part, without any prepayment fee or penalty," so long as the payment is made "in lawful money of the United States of America, which, at the time of payment, is legal tender for the payment of public and private debts therein." Notes at 1. They also contain an acceleration clause, permitting LRA to demand the full amount due, and all accrued interest, "immediately on the occurrence or existence of" an "Event of Default." Notes at 1. As relevant here, an Event of Default occurs when "(a) any payment required by [each] Note is not made when due; or (b) any default occurs in the performance of any covenant, obligation, warranty or provision contained in [each] Note." *Id.*

### 2.    The Guarantee

Mr. Brenes is the maker of a guarantee, dated July 8, 2019, which he executed "to induce the Lender [LRA] to extend financial accommodation to the Borrower [BLG]." Compl. Ex. C (Dkt. 1-1, at ECF pp. 17-21) (Guarantee) at 1. Section 1(a) of the Guarantee reads, in relevant part:

Subject to the provisions of Section 1(b) of this Agreement, Guarantor hereby unconditionally and irrevocably guarantees to Lender the prompt and complete payment when due (whether at the stated maturity, by acceleration or otherwise) of any and all present and future indebtedness and obligations of Borrower, mature or contingent, at any time and from time to time outstanding, in connection with the Note.[6]

* * *

All such indebtedness and obligations . . . are referred to in this Agreement as the "Indebtedness" and will be payable by the Guarantor to the Lender at such payment office as the Lender may notify the Guarantor of in writing, in Dollars, immediately on demand in the event of any default of the Borrower with respect to any payment when due of the Indebtedness or any part thereof, without setoff or counterclaim.

Guarantee § 1(a).

Section 1(b), which operates to limit the broad language of § 1(a), states that, "[a]nything herein [to] the contrary notwithstanding, Guarantor shall be liable hereunder only to the extent that Borrower fails to repay any Indebtedness as a result of" eleven specific circumstances, including, as pertinent here:

(x)    Any intentional act by the Guarantor or the Borrower that prevents, delays or hinders the perfection of the Lender's security interest granted under the Note or otherwise results in any material damage or diminution in value of any of the security interest or the Lender's interest therein.

(xi)    The Guarantor or the Borrower disaffirms, disclaims, repudiates or rejects, in whole or in part, or challenges the validity of the Note, this Agreement, or any term or provision thereof.

Guarantee § 1(b). The Guarantee also includes a paragraph titled "Waivers of Defenses," which provides, in relevant part:

Guarantor, to the fullest extent permitted by law, waives: . . . (d) any defense based upon or arising out of any defense which the Borrower may have to the payment or performance of any part of the Indebtedness; . . . (g) irregularity or unenforceability of any agreement or instrument representing or governing or securing the

---

[6] As used in the Guarantee, the term "Note" means "the Promissory Note of even date herewith issued by Brenes Law Group, PC (the 'Borrower') to the Lender, as such Promissory Note may from time to time be amended, restated, replaced, novated, supplemented or otherwise modified[.]" Guarantee at 1.

> Indebtedness . . . and (i) any other defense in law or equity (other than the defense that the Indebtedness has been indefeasibly paid in full) which, under applicable law, would release the obligation of a guarantor or surety, until the Indebtedness has been indefeasibly paid in full.

Guarantee § 4.

Section 11 of the Guarantee, titled "Guarantee Absolute," states that the Guarantor "knowingly accepts the full range of risk encompassed within a contract of 'continuing guaranty', which risk includes the possibility that the Borrower will contract additional Indebtedness for which the Guarantor may be liable . . ." *Id.* § 11. It continues: "The liability of the Guarantor under this Agreement shall be absolute and unconditional, in accordance with its terms, and shall remain in full force and effect without regard to, and shall not be released, suspended, discharged, terminated or otherwise affected by any circumstance whatsoever." *Id.*

Both the Notes and the Guarantee are governed by New York law and provide that any legal action or proceeding to enforce them may be brought in the courts of the State of New York located in the City of New York or in this Court. *See* Notes at 2; Guarantee §§ 12, 13.

### 3. The Alleged Breaches

LRA alleges upon information and belief that "the condition for triggering the 'Payment Date' has been triggered, although Brenes has failed to disclose information about the status of its cases to LRA." Compl. ¶ 12.[7] It further alleges that, even if no Payment Date was triggered, LRA "had the right to accelerate the Notes," *id.* ¶ 13, and demand immediate payment of both principal and interest, because, on an unspecified date, it learned that, "[a]ccording to public records filed with the State of California, on or about October 13, 2020, [BLG] executed a financing transaction

---

[7] LRA provides no further information as the triggering event(s). It does not allege that BLG received any particular payment, in any particular product liability litigation, on (or by) any particular date. Nor does it specify the basis for its information and belief that *some* triggering event occurred.

pursuant to which it granted a third-party lender a general security interest in its assets, including, on information and belief, the Collateral for the Notes." *Id.* ¶ 17. This grant of "a security interest in the Collateral," as defined in the Notes, "triggered an Event of Default under the Notes, thus providing LRA a right of acceleration." *Id.* ¶ 18. Consequently, on January 21, 2022, LRA "demanded payment from [BLG] for all amounts due under [the Notes] within three days." *Id.* ¶ 19 & Ex. D (Dkt. 1-1 at ECF pp. 30-32).

That demand letter directed BLG to "immediately pay the unpaid balance due under the Notes, inclusive of interest to the date of payment[.]" Compl. Ex. D, at ECF p. 31. The letter set forth the principal and interest due as of January 21, 2022 ($2,296,068.49 in total), the method of calculation for the accrued interest on each Note, the total number of days for which interest was calculated, a "per diem" interest figure (at 17.5%), and wire instructions. *Id.* at ECF pp. 31-32. The letter advised that if payment was not made within three days, a lawsuit would be filed against BLG (on the Notes) and Mr. Brenes (on the Guarantee), seeking principal, accrued interest to the date of default, "penalty interest at the rate of 20% per annum" thereafter, and fees and costs. *Id.* at ECF p. 31.[8]

Despite LRA's demand, BLG "failed to pay LRA the principal and accrued interest due under the Notes as required under the Notes and as demanded in LRA's notice." Compl. ¶ 20. LRA therefore asserts one claim against BLG for breach of the Notes and one claim against Mr. Brenes for breach of the Guarantee. *Id.* ¶¶ 21-28. On both counts, LRA seeks payment of the entire sum due on January 21, 2022, including pre-default interest to that date at a rate of 17.5%, plus "post-default interest" at the rate of 18%, as well as fees and costs. *Id.* at 5.

---

[8] In fact, as noted above, the default interest rate set forth in the Notes is 18%.

## C.    Facts Alleged in the Answer and Counterclaims

In 2016 – long before the events described in the Complaint – BLG entered into an Attorney Association Agreement with LRA's affiliate LLG, which, as amended in 2017 (the Association Agreement), contemplated that the two law firms would collaboratively pursue certain types of personal injury actions and share the associated fees and costs. Ans. at 12, ¶¶ 1-2; *see also* Podell Decl. (Dkt. 8) ¶¶ 4-5 & Ex. B (Assoc. Ag.).[9]

In or around early 2019, Berger and Goldberg suggested that BLG "shift its line of credit from a third-party lender to LRA." Ans. at 12, ¶ 5. After an "underwriting process," LRA declined to offer a line of credit, but agreed to lend money to BLG pursuant to "promissory notes on an as needed basis," *id.* at 12, ¶ 6, and ultimately loaned the $1.6 million at issue in this action, evidenced by the Notes. *Id.* at 3, ¶¶ 7-8.[10]

By September 2019 – the same month in which Note 2 was executed – LLG breached the Association Agreement by refusing to contribute its share of the expenses for the personal injury actions the firms were pursuing together. Ans. at 13, ¶ 8. Since then, LLG "has not contributed in any way . . . to any of the cases retained by [LLG] or BLG under the Attorney Association Agreement." *Id.* At some point thereafter, the BLG Parties learned that LLG was a "sham law firm" formed "for the sole purpose of nonlawyers marketing for and sharing in attorney fees for product liability cases." *Id.* at 13-14, ¶ 11.

---

[9] For a more detailed description of the Association Agreement, *see* Op. at 2-3.

[10] Defendants admit that BLG executed Note 1, but deny that it was signed on July 8, 2019, which is the date it bears. Ans. at 3, ¶ 7. According to the defendants, BLG initially executed "one promissory note" on July 9, 2019, at LRA's request, but LRA then "demanded that BLG execute a revised promissory note on July 10, 2019 [that is, Note 1], which BLG was forced to do" before LRA would advance the initial $1.1 million loan. *Id.* Defendants do not explain how BLG was "forced" to sign Note 1. As to Note 2, defendants admit that BLG executed it, *id.* at 3, ¶ 8, make no claim that it was "forced" to do so, and do not challenge its date. *Id.* at 3, ¶ 8.

### 1.    BLG Attempts to Repay the Notes

BLG was concerned that it would be held "hostage" to LRA once it "challenged [LLG] for its breach of the Attorney Association Agreement[.]" Ans. at 14, ¶ 12. Consequently, in September 2020, BLG "sought to repay the entire debt owed to LRA," including all accrued interest on both Notes. *Id.*[11] To do this, BLG "negotiated a new line of credit from a third-party entity that included amounts specifically earmarked to pay all debts owed to LRA." *Id.* at 14, ¶ 14.

### 2.    LRA Blocks Repayment

The third-party lender requested that "LRA sign a letter indicating [the Notes] had been paid off once the funds were transferred." Ans. at 14, ¶ 14. However, LRA "refused to sign the payoff letter." *Id.* at 14, ¶ 15. Instead, "through its agent Berger," LRA demanded that the letter include language stating that the Association Agreement between BLG and LLG was "valid, enforceable, [and] in good standing." *Id.* Mr. Brenes balked, "repeatedly" explaining that "it was improper to hold BLG's ability to pay its debts to LRA and obtain alternative funding hostage by demanding that BLG falsely state that an agreement with a separate entity not having anything to do with those debt[s] was enforceable and in good standing." *Id.*

When LRA refused to provide a payoff letter that did not also validate the Association Agreement, BLG's third-party lender "agreed to dispense with the requirement of a payoff letter." Ans. at 14, ¶ 16. At that point – on October 29, 2020 – BLG informed LRA that "all [it] needed to pay off all debts owed by BLG to LRA was the current amount owed and the account information necessary to wire the money." *Id.* at 14-15, ¶ 16. However, for the next three months – through

---

[11] Elsewhere in their pleading, the BLG Parties state that BLG attempted to pay off the Notes in 2019. *See* Ans. at 4-6, ¶¶ 13-14, 17-20.

January 2021 – LRA "refused to disclose the amount owed or the relevant account information so that BLG could pay off the debts owed to LRA pursuant to all promissory notes." *Id.* at 15, ¶ 16.

BLG "eventually gave up the effort to repay LRA," because "it was clear that LRA would not cease its bad faith efforts to hold BLG hostage by preventing repayment from the third party lender" and by "preventing other lenders [from working] with BLG." Ans. at 15, ¶ 17. BLG "eventually" negotiated another line of credit, "which included setting aside an estimated amount owed to LRA." *Id.* at 15, ¶ 18. Since "early 2021," BLG has had to pay interest on that amount. *Id.*[12]

### 3.    The Breach of Covenant Counterclaim

On the basis of these allegations, the BLG Parties accuse LRA of breaching the covenant of good faith and fair dealing implied into the Notes "by intentionally and knowingly preventing BLG from repaying the debts in 2020 and 2021." Ans. at 15, ¶ 2. The BLG Parties assert that they have suffered financial harm in the form of (i) "any interest that was owed to LRA that accrued after September 2019 [sic]," and (ii) "the interest that BLG accrued on the funds that were set aside by BLG to repay LRA in early 2021." *Id.* at 15-16, ¶ 4.[13]

---

[12] BLG does not identify either the third-party lender that offered it a line of credit in 2020 or the third-party lender with whom it "eventually" negotiated another line of credit in "early 2021." Nor does it explain why, once it received LRA's January 21, 2022 demand letter (including an interest calculation and wire instructions), it did not take that opportunity to pay off the Notes – or, at a minimum, pay the principal and interest accrued through the date on which it first attempted to pay off the Notes – out of its current line of credit, which included an amount set aside for that very purpose. While LRA might not have accepted that amount as full satisfaction of the Notes, it would have significantly reduced the amount remaining in dispute between LRA and the BLG Parties – and would have stopped default interest from running at 18% on the entire principal amount.

[13] BLG's theory of damages seems over-ambitious. Had BLG used its new line of credit to pay off the Notes, that would have stopped interest running to LRA, but interest on the payoff amount would presumably continue to accrue on BLG's new line of credit, regardless of LRA's conduct.

### 4.    The Affirmative Defenses

On the basis of the same factual allegations, the BLG Parties plead seven affirmative defenses: (1) that LRA has unclean hands; (2) that LRA's claims are barred or limited by its own breach of its obligations under the Notes; (3) that by preventing the BLG Parties from paying the Notes, LRA failed to mitigate its damages; (4) that the BLG Parties' performance was excused by LRA's interference with their ability to perform; (5) that the BLG Parties' performance was excused because LRA's conduct made performance impossible; (6) that LRA's claims are barred or limited under the doctrine of laches; and (7) that LRA's claims are barred or limited by its own bad faith actions. Ans. at 8-9, ¶¶ 1-7. Additionally, the BLG Parties plead two affirmative defenses unrelated to LRA's post-execution conduct: (8) that LRA's claims are barred or limited by New York's usury laws; and (9) that LRA's claims are barred or limited because LRA exerted "undue influence and duress on Defendants to demand unreasonable terms in the promissory notes." *Id.* at 9, ¶¶ 8-9.

## II.    ANALYSIS

### A.    Jurisdiction

The parties have invoked this Court's diversity jurisdiction pursuant to 28 U.S.C. § 1332(a)(1). Not. of Rem. ¶ 4; Ans. at 12, ¶ 8. Section 1332(a)(1) provides that a federal district court has original jurisdiction in cases among "citizens of different States," where the matter in controversy exceeds $75,000. The statute requires "complete" diversity; that is, "all plaintiffs must be citizens of states diverse from those of all defendants." *Pennsylvania Pub. Sch. Emps.' Ret. Sys. v. Morgan Stanley & Co.*, 772 F.3d 111, 118 (2d Cir.), as amended (Nov. 12, 2014) (*citing Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 553 (2005)).

Because subject matter jurisdiction goes to "a court's power to hear a case," the issue "can never be forfeited or waived," *United States v. Cotton*, 535 U.S. 625, 630 (2002), and "federal

courts have a duty to inquire into their subject matter jurisdiction *sua sponte*" even if the parties do not raise it. *Hermès of Paris, Inc. v. Swain*, 867 F.3d 321, 324 n.3 (2d Cir. 2017) (quoting *F5 Capital v. Pappas*, 856 F.3d 61, 75 (2d Cir. 2017)). "[T]he party seeking to invoke jurisdiction under 28 U.S.C. § 1332 bears the burden of demonstrating that the grounds for diversity exist and that diversity is complete." *Herrick Co., Inc. v. SCS Commc'ns, Inc.*, 251 F.3d 315, 322-23 (2d Cir. 2001) (cleaned up) (citations omitted).

In this case, the undisputed allegations set forth in the Complaint show that BLG and Mr. Brenes are citizens of California. Compl. ¶¶ 5-6.[14] Similarly, the undisputed allegations set forth in the Answer and Counterclaims show that LLG is a citizen of New York and Florida, because its three partners are citizens of either New York or Florida. Ans. at 10-11, ¶¶ 3-5.[15] However, the pleadings do not clearly show that plaintiff LRA is *not* a citizen of California, as required for complete diversity. *See* Compl. ¶ 4 (alleging that LRA is "a limited liability company organized under the laws of the State of New York," with its principal place of business located in Westbury, New York); Ans. at 9, ¶ 1 (mistakenly reciting that LRA claims to be a "corporation organized

---

[14] "An individual's citizenship, within the meaning of the diversity statute, is determined by his domicile," *McKie v. Kornegay*, 2022 WL 4241355, at *1 (2d Cir. Sept. 15, 2022) (quoting *Van Buskirk v. United Grp. of Cos., Inc.*, 935 F.3d 49, 53 (2d Cir. 2019)), while a corporation is a citizen "of every State and foreign state by which it has been incorporated and of the State or foreign state where it has its principal place of business." 28 U.S.C. § 1332(c)(1). "A law firm taking the form of a professional corporation . . . is likewise a citizen of both the state of incorporation and of the state where it has its principal place of business." *Toribio Abreu v. Portela L. Firm P.C.*, 2022 WL 2669228, at *2 (S.D.N.Y. July 11, 2022); *accord Hamil v. DePuy Orthopaedics, Inc.*, 2013 WL 3071170, at *1 (C.D. Cal. June 18, 2013).

[15] "[T]he citizenship of an artificial business entity other than a corporation is determined by reference to the citizenship of its members." *WGH Commc'ns, Inc. v. Penachio Malara LLP*, 2020 WL 4274741, at *1 (S.D.N.Y. July 23, 2020) (*citing C.T. Carden v. Arkoma Assocs.*, 494 U.S. 185 (1990)) (citations omitted). Thus, where a party is an LLC or an LLP, the citizenship of each individual member or partner must be pleaded or otherwise identified. *See Bayerische Landesbank, New York Branch v. Aladdin Cap. Mgmt. LLC*, 692 F.3d 42, 49 (2d Cir. 2012) (LLCs); *Hoguet Newman Regal & Kenney, LLP v. Lowe*, 2021 WL 4638539, at *1 (S.D.N.Y. Oct. 6, 2021) (LLPs).

under the law[s] of New York"); *id.* at 9-11, ¶¶ 2-4 (identifying three New York residents as "employees," "agents," "owners," or "investors" in LRA, but failing to state whether these individuals also constitute all of LRA's members).

Where, as here, the pleadings fail to state all of the facts necessary to demonstrate subject matter jurisdiction, the Court may – in lieu of dismissing the case – permit the pleadings to be amended. *See Fund Liquidation Holdings LLC v. Bank of Am. Corp.*, 991 F.3d 370, 388-89 (2d Cir. 2021), *cert. denied*, 142 S. Ct. 757 (2022); *Durant, Nichols, Houston, Hodgson & Cortese-Costa P.C. v. Dupont*, 565 F.3d 56, 64 (2d Cir. 2009). Consequently, I have directed LRA to identify and disclose the citizenship of each of its members. (Dkt. 30.) If (as appears likely) none of those members is a citizen of California, I will permit defendants to amend their pleading accordingly.

### B. Legal Standards

#### 1. Rules 8(a)(2) and 12(b)(6)

Fed. R. Civ. P. 8(a)(2) requires that a pleading contain "a short and plain statement of the claim showing that the plaintiff is entitled to relief." If that "short and plain statement" fails to present "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face," the deficient claims may be dismissed pursuant to Fed. R. Civ. P. 12(b)(6). *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 65 (2d Cir. 2012) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. If the plaintiff has not "nudged [his] claims across the line from conceivable to plausible, [the] complaint must be dismissed." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The same standards apply where, as here, the pleading at issue is a

counterclaim. *Morgan Art Found. Ltd. v. Brannan*, 2020 WL 469982, at *7 (S.D.N.Y. Jan. 28, 2020); *A.V.E.L.A., Inc. v. Est. of Marilyn Monroe, LLC*, 131 F. Supp. 3d 196, 203 (S.D.N.Y. 2015).

When faced with a motion made pursuant to Rule 12(b)(6), the court must "accept as true all factual statements alleged" and "draw all reasonable inferences in favor of the non-moving party." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007). However, those factual allegations "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. "[A] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 678 (internal citations omitted) (quoting *Twombly*, 550 U.S. at 555, 557). The courts will not "unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Id.* at 678-79. Thus, while Rule 8(a) "does not require 'detailed factual allegations,'" it requires "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Geldzahler v. New York Med. Coll.*, 663 F. Supp. 2d 379, 385 (S.D.N.Y. 2009).

### 2.    Fed. R. Civ. P. 12(f)

Fed. R. Civ. P. 12(f) permits a federal district court to strike any "insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." However, motions to strike affirmative defenses are committed to the discretion of the district court, *see Town & Country Linen Corp. v. Ingenious Designs, LLC*, 2020 WL 3472597, at *5 (S.D.N.Y. June 25, 2020), and are "generally disfavored." *Alcon Vision, LLC v. Lens.com, Inc.*, 2022 WL 1665453, at *3 (E.D.N.Y. May 25, 2022) (quoting *Silva v. Hornell Brewing Co.*, 2020 WL 8079823, at *2 (E.D.N.Y. Dec. 1, 2020). "To succeed on a motion to strike an affirmative defense, 'a plaintiff must show that: (1) there is no question of fact which might allow the defense to succeed; (2) there is no question of law which might allow the defense to succeed; and (3) the plaintiff would be

prejudiced by inclusion of the defense.'" *Sec. & Exch. Comm'n v. Rayat*, 2021 WL 4868590, at *2 (S.D.N.Y. Oct. 18, 2021) (quoting *GEOMC Co. v. Calmare Therapeutics Inc.*, 918 F.3d 92, 96 (2d Cir. 2019)); *accord Alcon Vision*, 2022 WL 1665453, at *3; *Town & Country Linen Corp.*, 2020 WL 3472597, at *5.

As to the first factor, the Second Circuit has clarified that "the plausibility standard of *Twombly* applies to determining the sufficiency of all pleadings, including the pleading of an affirmative defense." *GEOMC*, 918 F.3d at 98. However, courts appropriately recognize that "applying the plausibility standard to any pleading is a 'context-specific' task." *Id.* (quoting *Iqbal*, 556 U.S. at 679). Where the pleading at issue is an affirmative defense, the pleader has typically had a limited period of time to respond to the complaint and formulate its affirmative defenses. "That aspect of the context matters," *id.*, and, when considered together with "the nature of the affirmative defense," may warrant "a relaxed application of the plausibility standard." *Id.*[16] Even under that "relaxed" application of the standard, however, a defendant must support its affirmative defenses with "some factual allegations to make them plausible." *Id.*; *see also E.E.O.C. v. Kelley Drye & Warren, LLP*, 2011 WL 3163443, at *2 (S.D.N.Y. July 25, 2011) ("affirmative defenses that contain only 'bald assertions' without supporting facts should be stricken") (quoting *Shechter v. Comptroller of City of New York*, 79 F.3d 265, 270 (2d Cir. 1996)).

As to the second factor, an affirmative defense should also be stricken if – regardless of how well pleaded – it is "a legally insufficient basis for precluding a plaintiff from prevailing on its claims." *GEOMC*, 918 F.3d at 98; *see also Alcon Vision*, 2022 WL 1665453, at *3; *Town & Country Linen Corp.*, 2020 WL 3472597, at *5. Lastly, whether prejudice "should be a basis for

---

[16] Here, defendants filed the Answer and Counterclaim on March 3, 2023, immediately after they removed the case from state court. This was 28 days after LRA served its Complaint via certified mail. *See* Not. of Rem. ¶ 2.

dismissing or opposing the addition of an otherwise valid affirmative defense" is dependent on whether the defense is presented in a timely manner. *GEOMC*, 918 F.3d at 98.

### 3.    Implied Covenant of Good Faith and Fair Dealing

In New York (as in other jurisdictions), all contracts include an implied covenant of good faith and fair dealing. *Van Valkenburgh, Nooger & Neville, Inc. v. Hayden Pub. Co.*, 30 N.Y.2d 34, 45, 330 N.Y.S.2d 329, 333 (1972). The implied covenant of good fair and fair dealing is breached "when a party to a contract acts in a manner that, although not expressly forbidden by any contractual provision, would deprive the other party of the right to receive the benefits under their agreement." *Prakhin v. Fulton Towers Realty Corp.*, 122 A.D.3d 601, 602, 996 N.Y.S.2d 85, 88 (2d Dep't 2014); *see also Leberman v. John Blair & Co.*, 880 F.2d 1555, 1560 (2d Cir. 1989) ("The covenant of good faith and fair dealing precludes each party from engaging in conduct that will deprive the other party of the benefits of their agreement.") (cleaned up).

The implied covenant "embraces a pledge that 'neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.'" *Dalton v. Educ. Testing Serv.*, 87 N.Y.2d 384, 389, 663 N.E.2d 289, 291 (1995) (quoting *Kirke La Shelle Co. v. Paul Armstrong Co.*, 263 N.Y. 79, 87, 188 N.E. 163, 167 (1933)). It "encompass[es] 'any promises which a reasonable person in the position of the promisee would be justified in understanding were included.'" *511 W. 232nd Owners Corp. v. Jennifer Realty Co.*, 98 N.Y.2d 144, 153, 773 N.E.2d 496, 501 (2002) (quoting *Rowe v. Great Atl. & Pac. Tea Co.*, 46 N.Y.2d 62, 69, 385 N.E.2d 566, 569 (1978)).

However, the implied covenant "cannot be used to add wholly new terms to the contract," *Wagner v. JP Morgan Chase Bank*, 2011 WL 856262, at *5 (S.D.N.Y. Mar. 9, 2011) (quoting *Macfarlane & Assocs., Inc. v. Noxell Corp.*, 1994 WL 369324, at *3 (S.D.N.Y. July 13, 1994)), and "will not impose an obligation that would be inconsistent with the terms of the contract." *Iskalo*

*Elec. Tower LLC v. Stantec Consulting Servs., Inc.*, 174 A.D.3d 1420, 1423, 107 N.Y.S.3d 202, 206 (4th Dep't 2019) (internal citations and quotation marks omitted); *see also Trireme Energy Holdings, Inc. v. Innogy Renewables US LLC*, 2021 WL 3668092, at *5 (S.D.N.Y. Aug. 17, 2021) ("a court may not imply a covenant inconsistent with terms expressly set forth in an agreement").

### 4. Waiver

"A guaranty is a promise to fulfill the obligations of another party, and is subject 'to the ordinary principles of contract construction.'" *Cooperatieve Centrale Raiffeisen-Boerenleenbank, B.A. v. Navarro*, 25 N.Y.3d 485, 492, 36 N.E.3d 80, 85 (2015) (quoting *Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 188 F.3d 31, 34 (2d Cir. 1999)). "The fundamental objective of contract interpretation is to give effect to the expressed intentions of the parties." *Glob. Reinsurance Corp. of Am. v. Century Indem. Co.*, 22 F.4th 83, 94 (2d Cir. 2021) (quoting *Klos v. Polskie Linie Lotnicze*, 133 F.3d 164, 168 (2d Cir. 1997)). "Given that objective, 'the first principle of contract interpretation' is that 'where the language of the contract is clear and unambiguous, the contract is to be given effect according to its terms.'" *Id.* (quoting *Lilly v. City of New York*, 934 F.3d 222, 236 (2d Cir. 2019)). "If [a] contract is unambiguous, its meaning is likewise a question of law for the court to decide." *JA Apparel Corp. v. Abboud*, 568 F.3d 390, 397 (2d Cir. 2009) (*citing Revson v. Cinque & Cinque, P.C.*, 221 F.3d 59, 66 (2d Cir. 2000); *K. Bell & Assocs. v. Lloyd's Underwriters*, 97 F.3d 632, 637 (2d Cir. 1996)).

"[U]nder certain circumstances," an unconditional guarantee can "include a valid waiver of rights under New York law." *Exp.-Imp. Bank of U.S. v. Agricola Del Mar BCS*, 334 Fed. App'x 353, 354-55 (2d Cir. 2009) (summary order). A guarantee that is absolute and unconditional, and that waives defenses with specificity, is enforceable even against a defense of fraudulent inducement (which, under New York law, would ordinarily vitiate a contract). *Mfrs. Hanover Tr. Co. v. Yanakas*, 7 F.3d 310, 315 (2d Cir. 1993) (where "the contract states that a contracting party

disclaims the existence of or reliance upon specified representations, that party will not be allowed to claim that he was defrauded into entering the contract in reliance on those representations"); *see also Citibank, N.A. v. Plapinger*, 66 N.Y.2d 90, 92-95, 485 N.E.2d 974, 975-77 (1985) (where corporate officers agreed that their guarantee of a corporate obligation was "absolute and unconditional irrespective of any lack of validity or enforceability of the guarantee" and "irrespective of . . . any other circumstance which might otherwise constitute a defense" with respect to the guarantee, the officers could not set up a defense of fraudulent inducement of the guarantee). However, "the touchstone is specificity," such that "where specificity has been lacking, dismissal of the fraud claim has been ruled inappropriate." *Yanakas*, 7 F.3d at 316 (collecting cases). Thus, in *Yanakas*, where the guarantor "absolutely and unconditionally" guaranteed the borrower's indebtedness to the bank, 7 F.3d at 312, but the guarantee contained no specific "disclaimer as to the validity, regularity, or enforceability of the Guarantee itself," *id.* at 317, the Second Circuit held that the guarantor was entitled to plead – and prove, if he could – a counterclaim and three affirmative defenses which alleged that he was fraudulently induced to sign the Guarantee. *Id.* at 319.

Even where the guarantee is "absolute and unconditional," and the guarantor has unambiguously waived all defenses, New York law permits a guarantor to plead – and prove, if he can – that wrongful conduct by the lender, after the execution of the guarantee, created the conditions that allowed the lender to accelerate the liability against the guarantor. *See, e.g., Canterbury Realty & Equip. Corp.*, 135 A.D.2d at 106-07, 524 N.Y.S.2d at 534-35 ("wrongful conduct" by the lender, which "unfairly brought about the occurrence of the very condition precedent . . . upon which [the lender] relied to accelerate the loan against the guarantors" . . . "may serve to discharge the guarantor's obligation"). As the New York Court of Appeals explained in

*Navarro*, "*Canterbury* stands for the proposition that an absolute and unconditional guaranty does not foreclose a guarantor's challenge that the creditor's wrongful post-execution conduct triggered the event that accelerates or causes the guarantor's liability." 25 N.Y.3d at 496, 36 N.E.3d at 87.[17] *See also Red Tulip, LLC v. Neiva*, 44 A.D.3d 204, 208, 842 N.Y.S.2d 1, 5 (1st Dep't 2007) (not withstanding broad waiver language in guarantee, defenses based on lender's "active interference with refinancing . . . may be asserted to the extent they are relevant to [the guarantor's] claim that [the lender] made actual payment impossible") (cleaned up).[18]

## C.    Discussion

### 1.    Whether the First Counterclaim States a Plausible Claim for Breach of the Covenant

LRA seeks dismissal of the first counterclaim on the ground that it fails to state a claim for breach of the covenant of good faith and fair dealing because it lacks "a single plausible allegation that LRA, in fact, prevented BLG from prepaying the Notes." Pl. Mem. at 4. According to LRA, "if BLG wanted to pay off the Notes, it simply had to send to LRA the principal plus 'accrued interest with the date of prepayment,' in legal tender." *Id.* at 5. LRA's cooperation, therefore was "not required." *Id.* Nor was LRA required to provide a precise payoff quote because, it says, interest on the Notes was "calculated as simple interest." *Id.* Moreover, LRA argues, it was not required to "accept a wire transfer" because BLG "had to make any payment in legal tender," which

---

[17] The *Navarro* court went on to hold that *Canterbury* did not assist the guarantor in that case because the guarantor did not contend that the lender's conduct "led to the fraudulent transactions" that precipitated the guarantor's liability. 25 N.Y.3d at 496, 36 N.E.3d at 88.

[18] *Red Tulip*, like *Navarro*, ultimately held that *Canterbury* did not assist the guarantor in that case. In *Red Tulip*, the problem was one of proof: "[U]nlike *Canterbury*, the record in this case does not support a finding that [the lender] wrongfully caused [the borrower's] default or some other condition precedent that led to acceleration of the debt." 44 A.D.3d at 211, 842 N.Y.S.2d at 6. Moreover, the lender in *Red Tulip* did not "engage[] in wrongful conduct comparable to that of the bank in *Canterbury*." *Id.*

it "could easily have done" by "sending a bank check." *Id.* at 5. LRA does not directly address the claim that its initial response to BLG's payoff offer was to demand, improperly, that BLG validate the Association Agreement between BLG and LLG.

In their opposition brief, the BLG Parties assert that "[a]ny reasonable person in the position of BLG would be reasonably justified in believing that [the Notes] included a promise by LRA to disclose the amount owed so that BLG could ensure the total amount had been repaid." Def. Opp. Mem. (Dkt. 27) at 9. The payoff calculation, they say, was not obvious, because "there are multiple ways to determine how much interest had accrued," the Notes were "silent as to [the] method to be applied," and even though a footnote in each Note prompted the drafter to specify how interest should be calculated (what "day-count convention" would apply), "this clarification was never made." *Id.* at 10.[19] Similarly, according to the BLG Parties, "any reasonable person in the position of BLG would be reasonably justified in believing that [the Notes] allowed repayment via wire transfer – which is legal tender." *Id.* at 11. They add that a reasonable person would be "justified in believing that the promissory notes would include a promise by LRA to confirm repayment had been made once LRA had been fully repaid," without insisting on written concessions regarding the BLG-LLG relationship. *Id.* at 12.

The BLG Parties have the better end of this argument. The Notes gave BLG the right to prepay the entire balance at any time, without penalty, so long as payment was made "in lawful money of the United States of America, which, at the time of payment, is legal tender for the payment of public and private debts therein." Notes at 1. A dollar-denominated wire transfer is

---

[19] Among the methods for calculating interest accrual, according to the BLG Parties, are "30/360, 30/365, actual/360, actual/365, and actual/actual," each of which would produce a different payoff amount. Def. Opp. Mem. at 10. The BLG Parties add that "[t]here were also concerns as to whether LRA would deem the interest accrual as having begun on July 8, 2019 or later," given that Note 1 was not actually signed (according to the BLG Parties) until July 10, 2019. *Id.* at 11.

"legal tender," making it a permissible payment method under the Notes. *See Croford v. Bank of Am.*, 2009 WL 10670700, at *3 (C.D. Cal. Feb. 4, 2009) (rejecting the contention that "BofA's checks and wire transfers were not backed by coin or currency and were not legal tender but rather only BofA's credit"). Thus, a "reasonable person in the position of [BLG] would be justified in understanding" that payment could be made by wire. *511 W. 232nd Owners Corp.*, 98 N.Y.2d at 153, 773 N.E.2d at 501.

A reasonable person would also be justified in expecting the lender to disclose the amount it believed was owed when the borrower sought to pay off the debt. The BLG Parties are correct that the Notes are not dispositive on the interest calculation point. And while it is true, as LRA points out, that "[t]he internet offers many simple interest calculators," Pl. Mem. 5 n.4, those "simple interest calculators" frequently require the user to *choose* from among the various calculation methods available.[20] Thus, the BLG Parties have plausibly pled that LRA's refusal to provide a payoff amount, taken together with its refusal to provide wire instructions and its condition that BLG validate the Association Agreement, violated LRA's implicit pledge not to "do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Dalton*, 87 N.Y.2d at 389, 663 N.E.2d at 291. The fact that LRA provided *both* a precise payment amount *and* wire instructions a year later – when it declared the Notes in

---

[20] LRA provides two examples of online "simple interest calculators," offered by Calculator Soup and The Calculator Site. Pl. Mem. 5 n.4. Calculator Soup requires the user to choose either "days (365/Yr)" and "days (360/Yr)." *See* Calculator Soup, *Simple Interest Calculator A = P(1 + rt)*, https://www.calculatorsoup.com/calculators/financial/simple-interest-plus-principal-calculator. php (last visited Feb. 13, 2023). The Calculator Site does not require the user to make that choice. However, the result it returns is different from either of the figures produced by Calculator Soup – and from the "easily calculated" figure in plaintiff's brief. *See* The Calculator Site, *Simple Interest Calculator*, https://www.thecalculatorsite.com/finance/calculators/simple-interest-calculator.php (last visited February 13, 2023); Pl. Mem. at 5.

default and demanded payment in three days – underscores the lack of good faith and fair dealing that it displayed when BLG wanted to prepay its indebtedness.

Although BLG has adequately pleaded a counterclaim for breach of the covenant of good faith and fair dealing, Mr. Brenes has not, because, as plaintiff points out, "he is not a party to the Notes." Pl. Mem. at 10. Moreover, the only damages allegedly incurred as a result of the breach (extra interest payments) were incurred by BLG, not Mr. Brenes. *See* Ans. at 15, ¶ 18. Consequently, Mr. Brenes cannot, as a matter of law, sue LRA for breach of a covenant implied into the Notes. *See Thomas v. JPMorgan Chase & Co.*, 811 F. Supp. 2d 781, 798 (S.D.N.Y. 2011) (since "plaintiffs were neither parties to the [agreement] nor intended third-party beneficiaries of that agreement," they "cannot enforce any covenant of that agreement, express or implied"); *Four Winds of Saratoga Inc. v. Blue Cross & Blue Shield of Cent. New York Inc.*, 241 A.D.2d 906, 907, 660 N.Y.S.2d 236, 237 (3d Dep't 1997) ("There being no contractual relationship, neither can there be any 'covenant of good faith and fair dealing' implied which itself is based on the existence of a legal contractual obligation").

### 2.    Whether the Affirmative Defenses are Adequately Pleaded

Because the first counterclaim is adequately pleaded, affirmative defenses 1 through 7 – which rely on the same factual allegations – are adequately pleaded as well. Moreover, in the absence of an effective waiver (discussed *infra* Section II.C.3), the guarantor of a note has "the right to avail himself of any defense available to" the maker of that note. *Milliken & Co. v. Gans*, 82 A.D.2d 781, 781, 440 N.Y.S.2d 655, 656 (1st Dep't 1981); *see also Eur. Am. Bank & Tr. Co. v. Boyd*, 131 A.D.2d 629, 630, 516 N.Y.S.2d 714, 716 (2d Dep't 1987) ("a guarantor stands in the shoes of the principal and can avail himself of . . . those defenses available to it").

However, affirmative defenses 8 and 9 fail. There is no open question of fact or law that would allow either of the BLG Parties to show that LRA's claims are barred or limited by New

York's usury laws.[21] Ans. at 9, ¶ 8. Nor have the BLG Parties alleged any facts demonstrating that LRA "exerted undue influence and duress" on BLG "to demand unreasonable terms in the promissory notes." Ans. at 9, ¶ 9. The conclusory allegation that BLG was "forced" to sign Note 1 (in return for the first $1.1 million loaned to it by LRA), Ans. at 3, ¶ 7, is not plausible, even under the relaxed *Twombly* standard appropriate to the context, *GEOMC*, 918 F.3d at 98, because it lacks any supporting factual allegations. "Defendants have thus not met the standard set out by the Second Circuit in *GEOMC*, which requires them to support their defenses with at least '*some* factual allegations to make them plausible' under *Twombly*." *Silva*, 2020 WL 8079823, at *4 (quoting *GEOMC*, 918 F.3d at 99).

### 3.    Whether the Waiver Language in the Guarantee Bars Mr. Brenes From Asserting Any Affirmative Defenses

In LRA's view, Mr. Brenes is barred from asserting *any* affirmative defenses, because his "obligation under the Guarantee Agreement is unconditional . . . and it contains a broad waiver of all defenses except full payment." Pl. Mem. at 7. Plaintiff points out that, in § 1(a) of the Guarantee,

---

[21] New York law prohibits both civil and criminal usury. *Sabella v. Scantek Medical, Inc.*, 2009 WL 3233703, at *16 (S.D.N.Y. Sept. 25, 2009). Under the civil usury statute, a loan is void (with exceptions) if the interest rate exceeds 16%. N.Y. Gen. Oblig. Law § 5-501. However, corporations may not assert a civil usury defense in New York. N.Y. Gen. Oblig. Law § 5-521; *see also Ammirato v. Duraclean Int'l, Inc.*, 687 F. Supp. 2d 210, 220 (E.D.N.Y. 2010) ("A corporation may only 'assert criminal usury as a defense to repayment.'"). The criminal usury statute applies only where the interest rate exceeds 25%. N.Y. Pen. Law § 190.40; *Ammirato*, 687 F. Supp. 2d at 221; *see also Haymount Urgent Care PC v. GoFund Advance, LLC*, -- F. Supp. 3d --, 2022 WL 6994507, at *3 (S.D.N.Y. Oct. 12, 2022) (describing New York law as operating to permit a corporation to only interpose criminal usury as a defense and collecting cases). The interest rate on the Notes is 17.5%, and the default interest rate is 18%. Consequently, BLG, which is a corporation, cannot assert any usury defense. Nor can Mr. Brenes, because (waiver aside) the guarantor of a corporation's debt is limited to "the same usury defense to which the corporation is entitled." *Carlone v. Lion & the Bull Films, Inc.*, 861 F. Supp. 2d 312, 321-22 (S.D.N.Y. 2012); *see also Sabella*, 2009 WL 3233703, at *16 (individual guarantor of corporate debt could assert a criminal usury defense, if applicable, but could not assert a civil usury defense, because that defense was not available to the corporation).

Mr. Brenes "unconditionally and irrevocably" guaranteed BLG's indebtedness under the Notes, and in § 4 he waived (among other things): "(d) any defense . . . which the Borrower may have to the payment . . . of any part of the Indebtedness," "(g) [any] irregularity or unenforceability" of the Notes," and "(i) any other defense in law or equity (other than the defense that the Indebtedness has been indefeasibly paid in full), which, under applicable law, *would release the obligation of a guarantor or surety*[.]" Pl. Mem. at 7-8 (quoting Guarantee §§ 1(a), 4) (emphasis added). Relying on *Agricola Del Mar BCS*, 334 Fed. App'x at 354-55,[22] and *JPMorgan Chase Bank, N.A. v. Reifler*, 614 F. App'x 11 (2d Cir. 2015),[23] LRA argues that the waivers in § 4 of the Guarantee "are enforceable against Brenes" even if the borrower, BLG, could "avoid liability" based on its own affirmative defenses. Pl. Mem. at 8.

In response, Mr. Brenes invokes *Canterbury*, arguing that LRA's alleged misconduct, which interfered with BLG's ability to repay the Notes in 2020, "directly caused the alleged default and accelerated repayment, i.e., that BLG arranged a line of credit with a third-party provider without fully repaying LRA." Def. Mem. at 16. Thus, in Mr. Brenes's view, LRA's misconduct, which took place after he signed the Guarantee, "unfairly brought about the occurrence of the very condition precedent . . . upon which [LRA] relied" to trigger his liability under the Guarantee. *Canterbury Realty & Equip. Corp.*, 135 A.D.2d at 107, 524 N.Y.S.2d at 534-35. Thus, he reasons,

---

[22] In *Agricola Del Mar BCS*, the guarantors "unconditionally promis[ed] to guaranty the notes and explicitly waiv[ed] all legal rights, including the right to demand." 334 Fed. App'x at 354. The Second Circuit upheld the district court's grant of summary judgment on the guarantees, notwithstanding the guarantors' claim that they had not received any demand, because the "right to demand" was among the rights that they had validly waived. *Id.* at 354-55.

[23] In *Reifler*, the guarantor signed a document containing language similar to that now before the Court, but attempted to argue that he had only waived "defenses relating to the underlying loan obligations," and that the district court should therefore not have granted summary judgment to the lender over his "claim of fraudulent inducement," which "related to the Guarantee itself." 614 F. App'x at 13. The Second Circuit disagreed, finding the guarantee unambiguous and enforcing it against him in accordance with *Plapinger*. *Id.*

notwithstanding his broad waiver of "any" defense that would "release the obligations of a guarantor," Guarantee § 4(i), he is entitled under *Canterbury* to set up affirmative defenses based on LRA's "wrongful conduct." Def. Opp. Mem. at 15-16.

Mr. Brenes did not clearly articulate this theory in his affirmative defenses, none of which states, in plain terms, the theory upon which he now relies. Nor is it clear that the wrongful conduct alleged here, which was obstructionist but not fraudulent in nature, is "comparable to that of the [lender] in *Canterbury*." *Red Tulip*, 44 A.D.3d at 211, 842 N.Y.S.2d at 7. I note as well that it may be difficult, if not impossible, for Mr. Brenes to prove the linkage necessary to satisfy the narrow *Canterbury* exception to the usual rule that unconditional guarantees, which include clear waivers of otherwise-applicable defenses, are enforced according to their terms.[24] However, given the early stage at which the question has been presented, the relaxed plausibility standard applicable to hastily-pleaded affirmative defenses challenged pursuant to Rule 12(f), and BLG's entitlement to pursue defenses based on the same facts (such that striking those defenses as to Mr. Brenes would not narrow discovery or contain costs), I recommend, respectfully, that plaintiff's motion to strike be denied as to affirmative defenses 1 through 7.[25]

---

[24] To thread the needle and meet the *Canterbury* exception, it will not be sufficient for Mr. Brenes to prove that LRA's alleged breach of the covenant of good faith and fair dealing in 2020 caused BLG's October 13, 2020 grant of a general security interest in its assets to a third party. He will also have to prove that LRA's alleged misconduct caused BLG's failure to pay its indebtedness "when due," that is, when LRA accelerated the Notes and demanded payment on January 21, 2022. This is so because it was BLG's failure to pay in January 2022 – not its default in 2020 – that triggered Mr. Brenes's liability on the Guarantee. *See* Guarantee § 1(b) ("the Guarantor shall be liable hereunder only to the extent that the Borrower *fails to repay* any Indebtedness" as a result of the various circumstances set forth therein) (emphasis added).

[25] In its reply brief, LRA suggests, for the first time, that BLG (not just Mr. Brenes) waived its right to assert any and all counterclaims and affirmative defenses by virtue of its agreement, in the Notes, to make payments thereunder "without setoff, counterclaim or other defense." Pl. Reply Mem. (Dkt. 28) at 10 (quoting Notes at 1). Arguments raised for the first time in a reply brief may themselves be deemed waived. *See, e.g.*, *Fisher v. Kanas*, 487 F. Supp. 2d 270, 278 (E.D.N.Y. 2007) (collecting cases), *aff'd*, 288 F. App'x 721 (2d Cir. 2008). Even if LRA had raised this

### 4.    Defendants' Remaining Arguments

In their brief, defendants are not content to argue the sufficiency of the affirmative defenses they pled – they also argue that the Guarantee is itself "invalid due to a failure of consideration," Def. Mem. at 16, and is a "nullity," *id.* at 18, because (1) it applied only to the original note, executed on July 9, 2019, *not* to Note 1, which BLG was "forced" to execute the next day, *id.* at 4-5; (2) "there was a failure of consideration" for the original note, because LRA refused to provide the promised $1.1 million loan until after BLG executed Note 1, *id.* at 17; and (3) the original note, "to which the personal guarantee attached[,] was never accepted by LRA and [hence] was rendered [a] nullity." *Id.* at 18-19. Defendants add that a defense based on lack of consideration "cannot be waived," even by means of an unconditional Guarantee in which the guarantor has waived both the borrower's defenses and his own. *Id.* at 18-19.

These arguments, which pertain to affirmative defenses that appear nowhere in the Answer and Counterclaims, would be meritless even if they concerned defenses that Mr. Brenes actually pled. First, the defense of lack of consideration is indeed waivable. *See*, *e.g.*, *In re Lehman Bros. Holdings Inc.*, 541 B.R. 551, 571 (S.D.N.Y. 2015) (Sullivan, J.) (noting that "New York courts have specifically found that a 'hell or high water' clause [in a guarantee] may bar claims of lack of consideration," and collecting cases); *Liberty Mut. Fire Ins. Co. v. Mystic Transp., Inc.*, 2004 WL 2071703, at *3 (S.D.N.Y. Sept. 16, 2004) (Lynch, J.) ("an individual who executes an absolute and unconditional guaranty is precluded from raising . . . lack of consideration"); *Gen. Trading Co. v. A & D Food Corp.*, 292 A.D.2d 266, 267, 738 N.Y.S.2d 845 (1st Dep't 2002) (enforcing

---

argument in its moving papers, it would fail, as the language on which it relies – which appears to apply to individual payments under the Notes rather than lawsuits for breach of the Notes – is neither sufficiently clear nor sufficiently specific to effect a waiver of BLG's rights to plead otherwise-cognizable defenses and counterclaims in litigation.

unconditional guarantee which "effectively waived the defenses of fraud in the inducement and failure of consideration").

Second, the Guarantee clearly applies to Note 1, for which there was ample consideration, and which is not a nullity. In § 1(a) of the Guarantee, Mr. Brenes promised (subject to the limitations in § 1(b)) to guarantee all of BLG's "indebtedness and obligations," when due, under the "Note," which was defined to mean "the Promissory Note of even date herewith issued by Brenes Law Group, PC . . . *as such Promissory Note may from time to time be amended, restated, replaced, novated, supplemented or otherwise modified*." Guarantee at 1 (emphasis added).[26] Moreover, Mr. Brenes knowingly accepted "the full range of risk encompassed within a contract of 'continuing guaranty,'" including the "possibility that the Borrower will contract additional Indebtedness for which the Guarantor may be liable hereunder[.]" *Id.* § 11. Thus, regardless of the date on which Mr. Brenes (on behalf of BLG) signed Note 1 (in consideration of the first $1.1 million loan from LRA), he was well aware, when he did so, that Note 1 was backed by his Guarantee. The same is true with respect to Note 2, signed three months later (in consideration of the next $500,000).

Since LRA lent no funds on the original note, and does not sue on that note here, it is irrelevant to the present action whether, as defendants contend, that original note lacked consideration. Therefore, defendants' request for leave to amend their pleading to assert "a specific defense entitled of [sic] lack of consideration," Def. Mem. at 21, should be denied.

---

[26] Both the original note and Note 1 were dated July 8, 2019 on the first page and signed on the last page by Mr. Brenes (on behalf of BLG) "as of the date first set forth above." *See* Ans. Ex. 1 (Dkt. 3 at ECF pp. 20-22), at ECF p. 22; Note 1, at 4.

## III.    CONCLUSION

For the reasons set forth above, I recommend, respectfully, that plaintiff's motion (Dkt. 17) be GRANTED IN PART. The first counterclaim should be DISMISSED insofar as it is asserted by Mr. Brenes, and the eighth and ninth affirmative defenses should be STRICKEN entirely. In all other respects the motion should be DENIED.

Dated: New York, New York
       February 13, 2023

**BARBARA MOSES**
**United States Magistrate Judge**

## <u>NOTICE OF PROCEDURE FOR FILING OF OBJECTIONS</u><br><u>TO THIS REPORT AND RECOMMENDATION</u>

The parties shall have 14 days from this date to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b). *See also* Fed. R. Civ. P. 6(a) and (d). Any such objections shall be filed with the Clerk of the Court, with courtesy copies delivered to the Hon. Edgardo Ramos, United States District Judge, at 40 Foley Square, New York, New York 10007. Any request for an extension of time to file objections must be directed to Judge Ramos. **Failure to file timely objections will result in a waiver of such objections and will preclude appellate review.** *See Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Frydman v. Experian Info. Sols., Inc.*, 743 F. App'x, 486, 487 (2d Cir. 2018) (summary order); *Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C.*, 596 F.3d 84, 92 (2d Cir. 2010).