UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X

LEGAL RECOVERY ASSOCIATES LLC,

                Plaintiff,

  -against-

BRENES LAW GROUP, P.C. and TROY A. BRENES,

                Defendants.

------------------------------------------------------------------------X

Case No. 22-cv-1778 (ER)(BCM)

**ANSWER TO COUNTERCLAIM**

      Plaintiff Legal Recovery Associates LLC (LRA), by its attorneys, Solomon & Cramer LLP, for its Answer to the Counterclaim of Brenes Law Group, P.C. (BLG) states:

## COUNTERCLAIM DEFENDANTS

1. As indicated in Plaintiff's Complaint, Legal Recovery Associates LLC ("LRA") alleges it is a corporation organized under the law of New York and having its principal place of business in New York.

      Answer:   Admits.

2. Howard R. Berger ("Berger") is an individual and resides and is domiciled in the state New York. Berger has held himself out to Troy Brenes as being an employee and agent of LRA. After LRA, through its agent Berger, began to act in bad faith to prevent BLG from repaying its debts in late 2020, BLG discovered the following concerning information posted on the U.S. Securities and Exchange Commission regarding Berger and his propensity to act in bad faith and violate fiduciary duties:

> On September 21, 2012, the SEC filed a complaint against defendant Howard Brett Berger ("Berger') and his wife, Michelle Berger, as a relief defendant (collectively the "Bergers"). The complaint alleged that no later than July 2008 through approximately early March 2010, Berger engaged in a fraudulent trade allocation scheme commonly referred to as "cherry picking." Berger utilized a direct-access trading platform to delay final allocation of the trades until the end of the trading day, frequently after the market closed, so he could determine whether the trades were profitable. Berger managed two hedge funds, Professional Traders Fund, LLC ("PTF") and Professional Offshore Opportunity Fund ("POOF") (collectively, the "Funds").

> Oftentimes, Berger cherry picked profitable trades from PTF and allocated those trades to his wife's brokerage account, and allocated unprofitable trades to POOF. As a result, Berger received at least $6.8 million in profits and avoided losses in his wife's account, and created tremendous losses to investors by passing on millions of dollars in losses to the Funds he managed.

On January 15, 2013, The United States District Court for the Eastern District of New York entered final judgement against Berger and his wife. The final judgment found the Bergers were jointly and severally liable to pay $5,399,456.16 in disgorgement and Berger was found liable for an additional $1,506,297.84, comprised of disgorgement, prejudgment interest, and a civil money penalty. Among other things, the final judgement also enjoined Berger from using any means or instrumentality of interstate commerce, or of the mails, or of any other facility of any national securities exchange to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

> Answer:   Denies, except admits that Berger is an individual who resides and is domiciled in New York. The allegations about Mr. Berger's regulatory history should be stricken as impertinent and immaterial under Rule 12(f) of the Federal Rules of Civil Procedure; *see generally Lipsky v Commonwealth United Corp.,* 551 F.2d 887, 894 (2d Cir 1976). In any event, the referenced SEC proceedings are a matter of public record and the documents speak for themselves.

3. Gregory Goldberg ("Goldberg") is an individual and resides and is domiciled in the state New York. Berger has held himself out to Troy Brenes as being an employee and agent of Lawrence Litigation Group, LLP and LRA.

   > Answer:   Admits, except denies that Greg Goldberg is domiciled in New York.

4. Gary Podell ("Podell") is an individual and resides and is domiciled in the state New York. Podell is believed to be an owner and investor in LRA and is a partner in Lawrence Litigation Group, LLP.

   > Answer:   Admits, except denies that Podell is an owner and investor in LRA

5. Lawrence Litigation Group, LLP ("Lawrence") holds itself out as a limited liability partnership engaged in the practice of law with its primary place of business in the District of Columbia. Per its filings with the District of Columbia, Lawrence has three partners — Goldberg, Podell, and Tae Shin. Tae Shin is an individual and resident of Florida.

   > Answer:   Denies, except admits that Lawrence Litigation Group, LLP is a D.C. limited liability partnership with a primary place of business in the District of Columbia, and admits that Goldberg and Podell are partners in the firm.

6. The true names and capacities of those Counterclaim Defendants designated as DOES 1 through 50, inclusive, whether individual, corporate, associate or otherwise are unknown to Counterclaimants at the time of filing this Complaint, and Counterclaimants, therefore have sued said Counterclaim Defendants by such fictitious names. When the true names,

identities or capacities of said fictitiously designated Counterclaim defendants are ascertained, Counterclaimants will seek leave of court to amend this complaint to insert the true names, identities, and/or capacities of DOE Counterclaim Defendants, together with the proper charging allegations.

>   Answer:   Denies knowledge or information sufficient to form a belief as to the truth of the allegations.

7. Counterclaim Plaintiff believe, and therefore allege, that each unknown Doe Counterclaim Defendant[*sic*] 1-50 are, in some manner, legally responsible for the events and happenings set forth in this Complaint, and proximately caused injury and damages to Counterclaim Plaintiffs, as alleged herein.

>   Answer:   Denies knowledge or information sufficient to form a belief as to the truth of the allegations.

## DIVERSITY JURISDICTION REMAINS

8. Adding these Counterclaim Defendants to this Action does not destroy diversity jurisdiction as complete diversity still exists between Defendants, Brenes Law Group, P.C. and Troy A. Brenes, and all other parties.

>   Answer:   Admits that the Court has subject matter jurisdiction under 28 U.S.C. § 1441(b) and 28 U.S.C. § 1332(a)(1).

## STATEMENT OF FACTS REGARDING DEFENDANTS' AND COUNTERCLAIMANT PLAINTIFFS' AFFIRMATIVE DEFENSES AND COUNTER CLAIMS

1. On or about December 29, 2016, BLG entered into attorney association agreement with a law firm called Lawrence regarding certain product liability cases.

>   Answer:   Admits.

2. On or about March 3, 2017, BLG and Lawrence amended their co-counsel relationship agreement to, *inter alia*, include a requirement that Lawrence contribute a minimum dollar amount on a monthly basis towards working up and litigating the joint cases.

>   Answer:   Denies, except admits that BLG and Lawrence entered into a Second Amended Attorney Association Agreement and one of the terms required Lawrence to "contribute $28,000.00 a month toward the costs of litigating … joint venture cases," subject to the terms of the amendment.

3. These agreements were negotiated with Berger and Goldberg.

>   Answer:   Admits.

4. Because Lawrence held itself out as having its primary place of business in the District of Columbia and that it was subject to the rules of D.C. Rules of Professional Conduct, BLG

3

required that Lawrence guarantee in the contract that, Lawrence "as a law firm with its primary place of business in the District of Columbia, represents it is in compliance and shall remain in compliance with the D.C. Rules of Professional Conduct relating to participation by non-lawyers." Troy Brenes also specifically requested that Lawrence confirm that the law firm was managed by a lawyer admitted to practice in the D.C. bar and was in fact practicing primarily in the D.C., which Lawrence did.

>   Answer:   Admits that Lawrence Litigation Group, LLP is a D.C. Limited Liability Partnership and that the attorney association agreements with BLG provided that it had "its primary place of business in the District of Columbia" and that it "is in compliance and shall remain in compliance with the D.C. Rules of Professional Conduct relating to participation of non-lawyers."

5. In or around early 2019, Berger and Goldberg suggested to Troy Brenes that BLG should shift its line of credit from a third-party lender to LRA, an affiliated entity to LLG.

>   Answer: Denies.

6. The originally negotiated agreement was that LRA would provide a line of credit of $5,000,000 to $10,000,000 to BLG. However, once the underwriting process was complete, LRA failed to offer a line of credit and instead offered to provide promissory notes on an as needed basis. Each time a promissory note amount was requested, Berger was a part of the process of obtaining the loan.

>   Answer: Denies, except admits that Berger, among others, was involved in the process of BLG obtaining various loans.

7. Upon on information and belief, LRA, Berger, Goldberg and Podell fraudulently and without BLG's permission obtained lines of credit from another entity based on the value of BLG's fee interest in its retained cases and used those lines of credit to market for, and refer to, or co-counsel those cases with other law firms in exchange for a portion of the legal fees. Upon information and belief, this entity was Curiam Capital.

>   Answer:   Denies.

8. By September 2019, Lawrence breached the co-counsel agreement by refusing to contribute the minimum monthly financial contribution. Despite repeated requests for Lawrence to meet its obligations, Lawrence has not contributed in any way whether in the form of financial contribution or litigation work to any of the cases retained by Lawrence or BLG under the Attorney Association Agreement since September 2019.

>   Answer:   Denies.

9. BLG has also learned that Lawrence breached the co-counsel agreement in other ways. BLG subsequently learned that LRA formed Lawrence as a sham law firm that was never compliant with the D.C. ethics rules that allow participation by and fee splitting to non-lawyers. The sole purpose of Lawrence appears to have been to allow non-lawyers to market for product liability cases and then refer those cases to legitimate law firms in exchange for

a portion of the attorney fees without making any effort to comply with the D.C. ethics rules that allow fee splitting to non-lawyers.

    Answer:    Denies.

10. Rule 5.4 of the Rules of Professional Conduct for D.C. prohibits fee splitting to non-lawyers unless certain requirements are met. These include: (1) that the law firm has a lawyer licensed in D.C., (2) the sole purpose of the law firm is providing legal services to clients, (3) the non-lawyers involvement is to provide professional services which assist the law firm in providing legal services to client as opposed to providing finical investment, (4) and the non-lawyers must not be partners in the law firm. Lawrence has not complied with these requirements and, therefore, cannot be deemed a legitimate law firm. Indeed, BLG is informed and believes and thereupon alleges that Lawrence did not even employ a lawyer licensed to practice law in D.C. until years after it was formed and marketed and sent product liability cases to BLG.

    Answer:    Denies.

11. LRA formed Lawrence as a sham law firm for the sole purpose of nonlawyers marketing for and sharing in attorney fees from product liability cases. BLG has already raised these concerns informally with the D.C. Bar and a formal complaint is being prepared.

    Answer:    Denies, except denies knowledge or information sufficient to form a belief as to the truth of BLG's claim to have raised concerns with the D.C. Bar and its intent to prepare a formal complaint.

12. In September 2020, BLG sought to repay the entire debt owed to LRA stemming from all promissory notes taken by BLG from LRA, including all accrued interest. BLG did this in part because it was concerned that LRA would hold BLG hostage by refusing to provide further loan amounts if BLG challenged Lawrence for its breach of the Attorney Association Agreement with BLG.

    Answer:    Denies, except admits that BLG entered into discussions with LRA to pay the entire debt, but that they never reached an agreement on the terms of repayment.

13. Confirming BLG's fears, LRA acted in bad faith to prevent BLG from repaying its debts under the promissory notes.

    Answer:    Denies.

14. BLG negotiated a new line of credit from a third-party entity that included amounts specifically earmarked to pay all debts owed to LRA. The third-party entity simply requested that LRA sign a letter indicating the promissory notes had been paid off once the funds were transferred.

      Answer:   Denies knowledge or information sufficient to form a belief as to the truth of the allegations, except denies that BLG's new lender ever offered to pay off the entire debt unconditionally.

15. In bad faith, LRA refused to sign the payoff letter. LRA demanded that the letter, which solely involved repayment of loans between BLG and LRA, include language regarding unrelated agreements between Lawrence and BLG. Specifically, LRA through its agent Berger demanded the letter include language stating that BLG's attorney association agreement between BLG and Lawrence, as discussed above, was "valid, enforceable, [and] in good standing." Troy Brenes repeatedly explained to agents of LRA, including specifically Berger, that it was improper to hold BLG's ability to pay its debts to LRA and obtain alternative funding hostage by demanding that BLG falsely state that an agreement with a separate entity not having anything to do with those debt was enforceable and in good standing. However, LRA and Berger refused to withdraw its bad faith demand.

      Answer:   Denies, except admits that Troy Brenes made certain statements indicating that he believed that LRA should disregard his intention to violate Lawrence's interest in case proceeds, and that LRA proposed language in the draft payoff letters to ensure that BLG did not violate its contractual obligations.

16. Seeing the unreasonable response from LRA, BLG's third-party credit provider agreed to dispense with the requirement of a payoff letter. Therefore, on October 29, 2020, BLG notified LRA and Berger that the payoff letter was no longer necessary and that all BLG needed to pay off all debts owed by BLG to LRA was the current amount owed and the accounting formation necessary to wire the money.

      Answer:   Denies knowledge or information sufficient to form a belief as to the truth of the allegations about BLG's third party credit provider. Admits that on October 28, 2020, Troy Brenes indicated that BLG needed a "statement of what LRA is owed under the promissory notes and the account information so we make repayment to [sic]."

17. Despite this communication and numerous additional communications through January 2021, LRA still refused to disclose the amount owed or the relevant account information so that BLG could pay off the debts owed to LRA pursuant to all promissory notes.

      Answer:   Denies.

18. BLG eventually gave up the effort to repay LRA as it was clear that LRA would not cease its bad faith efforts to hold BLG hostage by preventing repayment from the third party lender and thereby preventing other lenders to work with BLG.

      Answer:   Denies.

19. BLG was able to eventually negotiate another line of credit, which included setting aside an estimated amount owed to LRA. BLG has had to pay interest on that amount since early 2021.

    Answer: Denies knowledge or information sufficient to form a belief as to the truth of the allegations.

## **COUNTERCLAIMS BY COUNTERCLAIMANTS BRENES LAW GROUP, P.C. AND TROY BRENES**

### **I.**
### **COUNTER CLAIM FOR BREACH OF DUTY OF GOOD FAITH AND FAIR DEALING BY BLG AND TROY BRENES AGAINST LRA**

1. Counterclaim Plaintiffs incorporates by reference all factual allegations included in the Counter Claimants Statement of Facts above.

    Answer: Responses are incorporated.

2. LRA breached the duty of good faith and fair dealing owed to BLG and Troy Brenes by intentionally and knowingly preventing BLG from repaying the debts in 2020 and 2021.

    Answer: Denies.

3. This bad faith conduct consisted of, *inter alia,* refusing to disclose the total amount debt owed, refusing to disclose the account information necessary for BLG to wire repayment funds, and by demanding terms be inserted into a payoff letter required by BLG's new lender that had no relevance to the promissory notes or repayment thereof, but rather sought to force BLG into improper concessions regarding an attorney association agreement relationship with a separate entity.

    Answer: Denies.

4. As a result of LRA's breach of the duty of good faith and fair dealing Counterclaim Plaintiffs suffered financial harm. This includes, *inter alia,* any interest that was owed to LRA that accrued after September 2019. It also includes the interest that BLG accrued on the funds that were set aside by BLG to repay LRA in early 2021.

    Answer: Denies.

### **RELIEF REQUESTED**

WHEREFORE, LRA demands judgment dismissing the first counterclaim with an award to it of its costs of litigation, including attorneys' fees as provided in the Notes, costs, and such other and further relief as is just and proper.

Dated: New York, New York
March 13, 2023

                    SOLOMON & CRAMER LLP
                    *Attorneys for Plaintiff Legal Recovery*
                    *Associates LLC*

By:   **Andrew T. Solomon**
       _____
       Andrew T. Solomon
       asolomon@solomoncramer.com

25 West 39th Street, 7th Floor
New York, New York 10018
(212) 884-9102