```
                    UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF NEW YORK
------------------------------:

LEGAL RECOVERY ASSOCIATES LLC,: Case No.: 22-CV-1778

                    Plaintiff, :

        v.                     :

BRENES LAW GROUP P.C., et al.,: New York, New York

                    Defendant. : August 2, 2023

     ------------------------------:



            TRANSCRIPT OF STATUS CONFERENCE HEARING

        BEFORE THE HONORABLE BARBARA C. MOSES

            UNITED STATES MAGISTRATE JUDGE




APPEARANCES:

For Plaintiff:           SOLOMON CRAMER & SUMMIT LLP
                         BY:  Andrew T. Solomon, Esq.
                         PO Box 202
                         Old Westbury, New York 11568

For Defendant:           BRENES LAW GROUP
                         BY:  Troy Brenes, Esq.
                         100 Spectrum Center Drive
                         Irvine, California 92618



Proceedings recorded by electronic sound recording;
Transcript produced by transcription service.




            AMM TRANSCRIPTION SERVICE - 631.334.1445
```

```
 1              THE DEPUTY CLERK:  Legal Recovery
 2    Associates, LLC, v. Brenes Law Group, P.C., et al.;
 3    case number:  22-CV-1778.
 4              Counsel, please make your appearances for
 5    the record.
 6              MR. SOLOMON:  Good morning.  Andrew
 7    Solomon for the plaintiff, Legal Recovery
 8    Associates, LLC.
 9              THE COURT:  Good morning.
10              MR. SOLOMON:  Good morning, Judge.
11              MR. BRENES:  Morning, Your Honor.  Troy
12    Brenes on behalf of the defendants.
13              THE COURT:  Mr. Brenes, glad you could
14    make it.
15              MR. BRENES:  Thank you, Your Honor.
16              THE COURT:  All right.  You guys settling
17    this case or not?
18              MR. BRENES:  I won't speak for the
19    plaintiffs, but I don't believe settlement is in the
20    works, Your Honor.  We're open to it, but there is
21    an inclination to try to include a separate
22    arbitration with separate issues that clearly is not
23    going to reach settlement.
24              THE COURT:  All right.  This is, I take
25    it, an update from your joint status letter dated
```

1   July the 26th, where it was reported that the
2   negotiations had come close to resolving all
3   disputes.  Although as of that date, no resolution
4   had been reached.  Things have not gone well since
5   then?
6          MR. BRENES:  No, they haven't.  And
7   unfortunately, we have ceased discussions.
8          THE COURT:  Mr. Solomon?
9          MR. SOLOMON:  That's correct.
10         THE COURT:  Have you let the magistrate
11  judge in the Western District know that as well?
12         MR. SOLOMON:  I have.
13         THE COURT:  Okay.  Have you received a
14  decision on that motion in the Western District?
15         MR. SOLOMON:  We have not.  And my sense
16  is that Judge Roemer is going to write something,
17  and I'm not expecting anything in the next week or
18  two.
19         THE COURT:  Okay.  So where we are then,
20  I think, is that in this case, you have a discovery
21  cutoff on August the 25th, which is not very far
22  away.  You have three weeks and a couple of days.
23         According to your July 26 status letter,
24  document production is not yet complete.  The
25  plaintiff says that its production is complete.  The

1    defendant says it has produced -- defendants, I
2    should say, say they have produced responsive
3    documents, but they have various complaints about
4    the requests.  And it sounds to me like that issue
5    or group of issues will have to either be resolved
6    through further negotiations between the parties or
7    by me.  But it hasn't been teed up to me at present,
8    and no depositions have yet been taken.  There may
9    be as many as six, according to the folks that the
10   parties say they want to depose.  That's a fair
11   amount to get done in three weeks and a couple of
12   days, particularly given that there is another case
13   which is related to this case, but in which, at
14   present, I have no authority to do anything because
15   although I am the designated magistrate judge in
16   that case, no part of that case has yet been
17   referred to me by the district judge, Judge Ramos.
18          Which brings me to the July 27th deadline
19   that you have, and that I gave you back at our
20   initial case management conference in April.  You
21   had a July 27th deadline to either stipulate to a
22   consolidation of the two cases, which I think you
23   were both contemplating at the time, or to submit a
24   joint letter in both actions explaining why one or
25   both of you was balking at that.  And, in fact, I

1   have not seen either a stipulation or a joint

2   letter.

3              Mr. Solomon, what happened?

4              MR. SOLOMON:  I provided -- I spoke to

5   Mr. Brenes.  He said that he was not going to oppose

6   consolidation.

7              THE COURT:  Okay.

8              MR. SOLOMON:  Last week I provided him

9   with a stipulation that I drafted and asked him to

10  respond, and he has not responded.

11             THE COURT:  Mr. Solomon?

12             MR. BRENES:  Mr. Brenes, Your Honor.

13             THE COURT:  Sorry.  Mr. Brenes.  To my

14  right.

15             MR. BRENES:  It was provided on the

16  deadline.  I was out of the office that day.  To be

17  clear, I don't oppose consolidation.  I think we

18  both support it, and I think we will have that.  I

19  think we can hammer it out before we leave the court

20  today and get something filed today.

21             THE COURT:  Well, I hope so, because

22  you're in violation of a scheduling order at the

23  moment.  Look, I realize that whether you submit a

24  consolidation statement on July the 27th or on

25  August the 2nd isn't the end of the world, but I

```
 1    don't want you to get in the habit of thinking that
 2    deadlines in my orders are suggestions.  They're
 3    not.  They're court orders.  And under Rule 16(f), I
 4    will start sanctioning you.  And that will be
 5    annoying to you if you simply disregard them and
 6    think that you can make up new deadlines without
 7    asking me for permission to make up new deadlines.
 8              So what shall your new deadline be to
 9    either submit a consolidation stipulation or a joint
10    letter telling the Court what the problem is?  How
11    about close of business today?
12              MR. BRENES:  So I will be on a flight,
13    Your Honor.  I already approved the stip, so my
14    e-signature can be added and filed.  So I don't
15    think there's any issue with having that filed
16    today, so long as Mr. Solomon can do it.
17              MR. SOLOMON:  Yeah, I could do it.  I
18    just needed you to say that I could do it.
19              THE COURT:  Well, you've heard him say
20    it.  So that stip will be filed today?
21              MR. SOLOMON:  Yes, of course.
22              THE COURT:  Excellent.  And it will be
23    filed in both cases, and it shall happen.
24              Now, I remain unreferred in the second
25    action.  It would not surprise me if Judge Ramos
```

```
 1    referred it to me at such time as there's a motion
 2    or something else.  Wait, is there a motion?
 3    Someone said they were going to file a motion to
 4    strike some affirmative defenses in that case.  Has
 5    that happened?
 6                MR. BRENES:  I think plaintiff filed a
 7    motion that they wanted to strike something.
 8                MR. SOLOMON:  I filed a pre motion letter
 9    in accordance with Judge Ramos.
10                THE COURT:  All right.  Well, it wouldn't
11    surprise me if he ended up prompted by that letter
12    designating the case to me, but until and unless he
13    does -- excuse me, I should have said referred the
14    case.  I'm already designated on the case.  I'm not
15    yet referred, which means I haven't been activated,
16    so to speak.  And until something is referred to me
17    in that other case, I won't be able to get my arms
18    around it.
19                I want to remind the parties that you
20    have the option, and it's entirely up to you, there
21    is no obligation to go either way on this; but, of
22    course, you have the option of consenting to the
23    plenary jurisdiction of the magistrate judge in both
24    cases.  Once they are consolidated, then you will
25    get me for everything, like it or not, the good, the
```

1    bad and the ugly.

2              Consent to the magistrate judge's plenary

3    jurisdiction must be unanimous.  If it is not

4    unanimous, I don't want to hear about it.  I don't

5    want to know who's in favor and who's not in favor,

6    and it can be done at any time.  So if at such time

7    you both deem it appropriate, you can simply sign

8    the form.  A copy of it is on my web page.  A copy

9    of it, I believe, is on the district judge's web

10   page as well, and submit it to the district judge.

11             You also have the option of consenting to

12   the jurisdiction of the magistrate judge for an

13   individual motion, a motion that would otherwise be

14   dispositive and would have to result in a report and

15   recommendation that then goes up to the district

16   judge.  If you wish, for efficiency's sake, you

17   always have the option of consenting to the plenary

18   jurisdiction of the magistrate judge for that

19   individual motion.

20             But we are where we are at the moment.

21   The cases are not consolidated, and I am the

22   designated and referred magistrate judge in this

23   case only.  It strikes me that if you are not

24   settling the case, you are either going to need a

25   discovery extension or you're going to need some

```
1    fairly quick discovery motion practice to resolve
2    the disputes which are summarized in the joint
3    letter.
4              What do you think, Mr. Solomon, would be
5    the most efficient?
6              MR. SOLOMON:  Well, you know, I would
7    like to -- I would have teed up a motion, but I have
8    not had a chance to meet and confer with Mr. Brenes.
9    I've tried.  At some point --
10             THE COURT:  When's your flight, Mr.
11   Brenes?
12             MR. BRENES:  At 4:00, Your Honor.
13             THE COURT:  Great.  You have some time
14   today.
15             MR. BRENES:  Well, I'll wait until my
16   turn, your Honor.
17             MR. SOLOMON:  So after that meet and
18   conferral process, it won't take me more than a day
19   to put together the letter motion on these issues.
20   I think they're very straightforward.
21             THE COURT:  Give me the Reader's Digest
22   version, please.
23             MR. SOLOMON:  Well, there's been no
24   document production at all.
25             THE COURT:  Zero?  You haven't gotten any
```

```
 1    documents outside of the arbitration?

 2              MR. SOLOMON:  I have not gotten any

 3    documents outside of the arbitration.  They were

 4    produced.  In accordance with Your Honor's order, we

 5    had a conference about ESI.  I provided an email to

 6    Mr. Brenes.  I told him this is the search terms and

 7    this is the format we want, which is nothing

 8    special.  We just want to use it to put the

 9    documents into relativity.

10              We received in the arbitration documents,

11    where it's sort of continuous pages, multiple emails

12    on single pages, totally unusable for any purpose.

13    So we haven't gotten any documents.  That's, I

14    think, a significant issue.

15              THE COURT:  Again, I just want to qualify

16    that.  Outside of the arbitration, where there is a

17    fair amount of overlap, right?

18              MR. SOLOMON:  There is overlap in the

19    arbitration.  If I were to deem the arbitration

20    production as the production in this case, there

21    would still be substantial deficiencies, massive

22    deficiencies.

23              THE COURT:  Right.

24              MR. SOLOMON:  Which I can give you the

25    chapter and verse.
```

```
 1                    The Reader's Digest version is --
 2                    THE COURT:  No, we're still doing
 3     Reader's Digest.
 4                    MR. SOLOMON:  We're missing a lot --
 5     there's a lot of stuff that hasn't been produced.
 6                    THE COURT:  Okay.
 7                    MR. SOLOMON:  There's a significant issue
 8     about gaps in the production on emails, from what I
 9     can tell.  I raised that issue with Mr. Brenes on a
10     call.  He said that he has some kind of auto-delete
11     function that would have made so -- if things
12     weren't produced, they don't exist.  I tried to ask
13     him some follow-up questions.
14                    THE COURT:  You asked him whether he had
15     turned off auto delete by the time he was put on
16     notice of this litigation?
17                    MR. SOLOMON:  I was told that he will not
18     engage in discovery about discovery with me on the
19     call.  And I have Gmail.  I think his server is a
20     Gmail server.  I don't know of any auto-delete
21     function, but the production is incomplete.  And I
22     know that because there are emails, I mean, exactly
23     on issues between the parties that are --
24                    THE COURT:  Where you have your half, and
25     you can't get his half.
```

1          MR. SOLOMON:  Thank you.

2          THE COURT:  Okay.

3          MR. SOLOMON:  So there's that.  There's

4    been no production about California Attorney

5    Lending, which is the central focus of the case in

6    terms of the counterclaims, and --

7          THE COURT:  Which is why you're

8    subpoenaing California Lending.

9          MR. SOLOMON:  Correct.  And it's sort of

10   a -- I'm getting in a bad situation because

11   California Attorney Lending says, why are you

12   subpoenaing us; you should be able to get all these

13   documents from the parties.  That's their primary

14   defense that they advanced to Judge Roemer.  And I

15   said, Well, I haven't gotten anything, and I don't

16   know what exists, and the schedule doesn't permit

17   waiting to see what I get from parties before I

18   start subpoenaing.

19          So it put me at a bit of a disadvantage

20   in that case, not knowing what exists and what

21   doesn't exist and what's going to be produced.  But

22   we don't have the loan agreement, which is the --

23   that was the event that caused the default.

24          We don't have the security agreement.  We

25   don't have any information about the use of

1    proceeds, which would go to triggering the

2    guarantee, and also establishing the dates of

3    default for the various notes.  We don't have any

4    information about the reserve Escrow.

5              So if you recall, Your Honor, the

6    counterclaim, the damage that's claimed in the

7    counterclaim is that Brenda's Law Group had to

8    reserve money with California Attorney Lending in

9    order to pay Legal Recovery Associates when it got a

10   payoff.  And so it's paying double interest, which,

11   okay, that could be damages.  But we haven't got any

12   information about --

13             THE COURT:  The interest that it's paid

14   to California Lending.

15             MR. SOLOMON:  Nothing about the reserve,

16   nothing about the escrow.  I understand from counsel

17   that it was at some point released.  We have nothing

18   about the release.

19             THE COURT:  What was at some point

20   released?

21             MR. SOLOMON:  The reserve.  Whatever that

22   reserve requirement was.  So it hasn't been an

23   unending reserve.

24             But I would point out, Your Honor, that

25   Brenes Law Group closed its facility with California

```
1    Attorney Lending in October of --
2                    THE COURT:  Closed its account?
3                    MR. SOLOMON:  No, opened up the -- closed
4    the lending facility so it could borrow money from
5    California Attorney Lending.  Gave it security
6    interest in October of 2020, okay.
7                    On January 5th of 2021, and again later
8    in January, my client sent the Brenes Law Group the
9    wire instructions and the payoff information, just a
10   few months after the closing.  But there was no
11   payment in 2021 and there's been no payment since
12   then.
13                   So even if there was any damage as a
14   result of sort of refusal to provide information,
15   what we're talking about is a few months.
16                   THE COURT:  A few months of double
17   interest, you're saying?
18                   MR. SOLOMON:  If, in fact, it was double
19   interest.  If, in fact, that money was available.
20   But, you know, this idea that, oh, if you'd only
21   given me the payoff information, I would have paid
22   it.  And obviously, California Attorney Lending was
23   focused on paying off Legal Recovery Associates.
24                   Then what happened in January?
25                   THE COURT:  Why didn't they pay it off
```

```
 1    then?
 2              MR. SOLOMON:  Exactly.  So we don't have
 3    any information about any of this stuff.
 4              THE COURT:  I thought we had a brief
 5    discussion about that during our last conference
 6    back in April.  All right.
 7              Anything else you want to tell me?  Is
 8    there going to be a fight over how many deponents as
 9    well?
10              MR. SOLOMON:  Yes.
11              THE COURT:  Why?
12              MR. SOLOMON:  Brenes Law Group and Mr.
13    Brenes dealt with one person at Legal Recovery
14    Associates during this relevant period, which I'll
15    talk about -- which I'll say is the payoff period,
16    which maybe began in late July of 2020 and ended in
17    January of 2021.
18              THE COURT:  And which one was that?
19              MR. SOLOMON:  That was Howard Berger.
20              THE COURT:  Okay.
21              MR. SOLOMON:  So I've offered Howard
22    Berger.  I would probably move to quash Greg
23    Goldberg and Gary Podell, who had nothing to do with
24    the relevant transactions, and I don't really
25    understand why they should be deposed.
```

```
 1                    THE COURT:  Okay.  That's your Reader's
 2      Digest version of the looming discovery disputes?
 3                    MR. SOLOMON:  Yes, Your Honor.
 4                    THE COURT:  Mr. Brenes?
 5                    MR. BRENES:  So there's a lot there, Your
 6      Honor.  These issues were raised on Friday in an
 7      email.  Like I said, I was not in the office on
 8      Friday.  I spent all day yesterday traveling to get
 9      here.
10                    THE COURT:  Well, no, actually, at the
11      latest, they were identified when the two of you
12      were preparing the joint letter, which was last
13      Thursday.
14                    MR. BRENES:  The actual email that came
15      in that listed what the disputes are and why, I
16      believe came in Friday, and there was a subsequent
17      one on Monday.  Bottom line, Your Honor, is these
18      are new discovery disputes that have been raised.  I
19      have to review them.
20                    THE COURT:  That may be.  That may be.
21      But, Mr. Brenes, it is now August the 2nd.  And if
22      the first thing that Mr. Solomon said is true, and
23      the first thing he said was that you haven't
24      produced any documents other than what's been
25      produced in the arbitration, then you're behind the
```

1    eight ball here.

2            MR. BRENES:  But that's an assumption

3    that's not correct, Your Honor.

4            THE COURT:  What have you produced

5    outside of the arbitration?

6            MR. BRENES:  I was going to get to that

7    next part.  I told Mr. Solomon on the phone that the

8    production is meant to apply to both cases, so those

9    documents are usable here.

10            THE COURT:  That's not -- that may be,

11    but what he told me was that you haven't produced

12    any documents outside the arbitration, which I took

13    to mean you haven't produced any documents which are

14    not, at a minimum, also producible in the

15    arbitration.  Nothing for this case only.

16            MR. BRENES:  That's correct.  No, there's

17    one production that we've made that applies to both

18    cases.  As far as ESI, their request for production

19    did not have an ESI format request.  We did meet and

20    confer with the plaintiff, and we had a discussion

21    about that.  And plaintiff specifically told us,

22    look, if this is not a large production, we don't

23    need all particular ESI format, just produce them as

24    they're kept in the regular course of business.

25    That's what we did.

```
 1              I'm happy to discuss with them if they
 2    claim that's not usable, how we can do that.  As far
 3    as claims that we've withheld documents, it's just
 4    not true.  We can only produce what we have.  We do
 5    not have an auto-delete function.  But what I
 6    explained to Mr. Solomon on the phone is that, as a
 7    matter of business, we delete emails.  We try to
 8    clear our emails over time.  So obviously that
 9    stopped for anything relevant once these lawsuits
10    were filed.  But going back to 2019 --
11              THE COURT:  So you're saying that you --
12    who's at Brenes Law Group other than you; anybody?
13              MR. BRENES:  Yes.
14              THE COURT:  How many people?
15              MR. BRENES:  10, 12 people, Your Honor.
16              THE COURT:  10 or 12 people.  Lawyers and
17    non-lawyers?
18              MR. BRENES:  Yes.
19              THE COURT:  And you're saying that you
20    don't have any auto-delete program running, but that
21    it is a business practice to delete emails when; on
22    what schedule?
23              MR. BRENES:  To just try to clear emails.
24              THE COURT:  That's a little vague.  What
25    instructions do people actually get at your law
```

1    firm?

2              MR. BRENES:  To try to clear your email

3    inbox.  To try to keep it to only emails that you

4    absolutely need.  So we keep our server not overly

5    full.

6              THE COURT:  As I'm sure you know, because

7    even I know that you can delete an email and thereby

8    clear your inbox, but unless you make a special

9    effort to double delete it, it's still there on your

10   server.

11             MR. BRENES:  If you're talking about the

12   trash file, that's also deleted, because if you

13   don't delete that, then it doesn't do you any good

14   on your storage.

15             THE COURT:  So you do double delete?

16             MR. BRENES:  Yes.

17             THE COURT:  I see.  And is this written

18   down somewhere?  I am asking because it looks like

19   there may be discovery on discovery here, and I want

20   to see what that discovery on discovery is going to

21   look like.

22             MR. BRENES:  No, your Honor, we don't

23   have a written-down policy procedure.

24             THE COURT:  You just tell people, clear

25   on a regular basis, and clear it out of your trash

1   file as well?

2              MR. BRENES:  Yes.  And I personally try

3   to do that.

4              THE COURT:  Now, you're a law firm,

5   obviously you can't do that with respect to client

6   correspondence, right?  Not for seven years.

7              MR. BRENES:  Client correspondence goes

8   into a database, Your Honor.  It doesn't stay in a

9   Gmail system.

10              THE COURT:  Okay.  So you have long-term

11   storage for things you need or want to keep?

12              MR. BRENES:  Yes.

13              THE COURT:  But you're saying these

14   significant banking relationships, which are

15   important to the financing of your firm on a long

16   time -- on a long-range basis, you trash them?

17              MR. BRENES:  No, Your Honor, I didn't say

18   that.  So key emails, things that are clearly -- I

19   think are important, I don't delete.  Things that

20   don't appear to be important, I may delete.

21              I don't know what counsel is saying that

22   he has that we didn't produce.  And there's no

23   explanation for why he's claiming we didn't produce

24   documents.  So I'm in the dark.

25              THE COURT:  There's no explanation for

AMM TRANSCRIPTION SERVICE - 631.334.1445

```
1    why he's claiming that you didn't produce documents?
2                 MR. BRENES:  Why he's claiming our
3    production is incomplete, Your Honor.
4                 THE COURT:  All right.  So maybe the two
5    of you do need to stay after class.  You may use the
6    jury room, which is in the back if you like, because
7    it sounds like you have some meeting and conferring
8    to do.
9                 Do you want to get to the depositions?
10                MR. BRENES:  Yes.  So can I cover --
11   there were other issues he mentioned that I feel I
12   should cover.
13                THE COURT:  If you wish.  Go ahead.
14                MR. BRENES:  We're sort of getting to the
15   merits of the case a little bit.
16                So talking about the interest on the
17   escrow account, Your Honor was pretty negative about
18   that claim, and so, frankly, we're withdrawing that
19   claim.  So that's why we --
20                THE COURT:  You're withdrawing your
21   counterclaim?
22                MR. BRENES:  Well, the claim for the
23   interest that accrued on the money we had to set
24   aside.  When your motion practice and the last
25   hearing, your Honor, you were --
```

AMM TRANSCRIPTION SERVICE - 631.334.1445

1          THE COURT:  I think I said something to

2    the effect of, that is going to be a difficult

3    needle for you to thread.  But I meant that with

4    respect not just to that particular item of damage,

5    but to, really, your entire theory.

6          MR. BRENES:  I understand that, Your

7    Honor, but I think there's more to the personal

8    guarantee that you haven't had a chance to consider.

9          Specifically, it only applies in specific

10   situations.  It's specifically limited, and that

11   hasn't been addressed by the Court.  And none of

12   those facts for when it applies have been alleged,

13   nor can they be proved in this case.  So that's

14   something that will be addressed.

15          But beyond that, the second case that is

16   going to be joined to this one, Your Honor, there is

17   no personal guarantee at play in that case.  So that

18   largely goes away.

19          THE COURT:  So that's just against the

20   firm?

21          MR. BRENES:  Yes, that's correct.

22          THE COURT:  Okay.  I'm looking at your

23   actual counterclaims in this case.  You had a

24   counterclaim for the breach of duty of good faith

25   and fair dealing.  Counterclaim for unjust

```
 1    enrichment.  That's the one that went to
 2    arbitration, right?
 3              MR. SOLOMON:  Correct.
 4              THE COURT:  Counterclaim for fraud and
 5    fraudulent concealment went to arbitration.  So it's
 6    just the breach of the duty of good faith.
 7              MR. BRENES:  No.  So to be clear, we're
 8    not dropping the claim, Your Honor.
 9              THE COURT:  So what are your damages if
10    they're not double interest?
11              MR. BRENES:  The damages are that we're
12    arguing that the interest stopped accruing when they
13    prevented us from repaying the loan.
14              THE COURT:  Say that again.
15              MR. BRENES:  So there's interest on these
16    loans, right, these promissory notes.  At a certain
17    point, we try to repay the loan, they prevent us.
18    That's our position.
19              THE COURT:  That's your position.
20              MR. BRENES:  Our counterclaim is that was
21    a breach of the contract, and any interest we owe
22    them stops accruing at that point.  That's the
23    counterclaim.
24              THE COURT:  I see two problems with that
25    theory off the top of my head.  I may think of more
```

1    if you give me more time.

2            One, which isn't necessarily a

3    discovery-related issue, but is a problem for you,

4    is that you continued not paying the Legal Recovery

5    Associates loans even after you were provided with

6    wire instructions and so on.  So I think you're

7    going to have a difficult time explaining that.

8            Second, which is potentially a discovery

9    issue, is that the fact remains, whether the theory

10    of damages remains or not, the fact remains that you

11    took out another loan, correct, to, in effect, cover

12    your liability to Legal Recovery Associates.  And if

13    you were damaged, Legal Recovery Associates is, I

14    think, going to take the position that they're

15    entitled to look at your entire financial position,

16    because the question is whether there was a net

17    damage.

18            You can't just isolate a single financial

19    transaction and say, well, I have to continue to pay

20    interest for these three months or these four

21    months, or whatever it was on this loan if you were

22    doing other financial stuff that might have netted

23    out that liability.

24            Mr. Solomon?

25            MR. SOLOMON:  Well, I mean, there's a lot

1    of issues with the theory, but I would say this, at

2    most, what I thought we were talking about was

3    double interest during some period of time, which

4    could only be measured in a few months.

5            THE COURT:  Well, now he's down to single

6    interest, and I understand why he's saying it.  If

7    his theory of damages is a period of continued

8    interest obligation to your client that he wouldn't

9    otherwise have had, then all we have to look at to

10   determine the amount of the damages are the

11   financial transactions between your client and Mr.

12   Brenes's firm.  And you don't get to look at other

13   financial transactions that his firm was engaged in.

14           MR. SOLOMON:  Right.  So the problem with

15   that is that for two of the notes, the mere granting

16   of the security interest to California Attorney

17   Lending would have triggered a default.

18           THE COURT:  I understand.  Your theory is

19   it's relevant for liability, not just for damages.

20           MR. SOLOMON:  Correct.  We have to know

21   when there was a default on the other notes where

22   the granting of the security interest would not have

23   triggered a default, but the refusal or failure to

24   pay proceeds from the cases on those additional

25   notes would have triggered a default.

1          That's why we originally only moved on
2    the first -- that's why we've consolidated cases,
3    because we knew we had a default on the first two
4    notes, but we didn't know that we had a default on
5    the last six.  So that's one problem.
6          Another issue is that this whole
7    construct of the implied duty of good faith and fair
8    dealing presupposes that when Mr. Brenes and Mr.
9    Berger were communicating over this payoff, that Mr.
10   Berger was acting in bad faith, and, in fact, he was
11   acting in good faith.  In fact, he was trying to
12   make sure that this payoff transaction didn't
13   violate other agreements.  And Mr. Brenes was
14   saying, well, you know, those things are separate.
15         I don't know whether a court would
16   ultimately agree that negotiating over a payoff
17   letter is bad faith.  Ultimately, in October of
18   2020, when Brenes Law Group closed on this
19   financing, there was no disclosure to Legal Recovery
20   Associates, okay, we've closed, give us the number.
21   It went silent on October 28.  And then we didn't
22   hear back from Mr. Brenes or Brenes Law Group until
23   January 5, when he said, I've closed, I need that
24   payoff information.  And that same day, he received
25   that payoff information and didn't pay.

1          So there's a lot that was going on

2     between Mr. Brenes, his law firm and California

3     Attorney Lending, which made them think that this

4     was okay.  That it was going to be okay for him

5     to -- or excuse me -- for Brenes Law Group to get

6     this new financing, and also have the advantage of

7     essentially making Legal Recovery Associates an

8     involuntary lender and not pay them off.

9          So we need to know what happened.

10    Because this is about good faith, so it's got to be

11    good faith on both parts.  What was going on?  What

12    was it that Brenes Law Group was saying to

13    California Attorney Lending, which made California

14    Attorney Lending decide, you know what, if you want

15    to have two loans, that's fine with us, because

16    originally, California Attorney Lending was very

17    intent on receiving the payoff information.

18         So there's a lot that we don't know, and

19    we need that correspondence with California Attorney

20    Lending.  So when, for example, when --

21         THE COURT:  Okay.  Okay.  Reader's Digest

22    version.  Mr. Solomon is telling me and telling you

23    that he has a bunch of reasons why he's going to get

24    that California Attorney Lending file, either in the

25    Western District or here.

```
 1                    MR. BRENES:  I disagree, Your Honor.
 2      It's not relevant to the claims.  It's not
 3      proportional.
 4                    THE COURT:  What are you hiding there?
 5                    MR. BRENES:  There's nothing I'm hiding,
 6      but what he's asking for is information relating on
 7      every settlement my firm has ever done, every
 8      communication we've ever had with California
 9      Attorney Lending, including communications I had
10      with them going back years, before any sort of
11      relationship involved them.
12                    These are not reasonably-tailored
13      requests, Your Honor, and they're not necessary.
14      Their claim is, once you entered into an agreement
15      with California Attorney Lending, you breached these
16      promissory notes, and you were in breach.
17                    THE COURT:  Triggering default interest
18      and so on.
19                    MR. BRENES:  That's their argument.  So
20      all they need to know is, when did that happen.  And
21      they know when it happened.  We told them.  And so
22      there's no dispute.  But, you know, if they want to
23      send a -- that can be answered with a simple
24      discovery request.  When did you finalize an
25      agreement with California Attorney Lending?  Because
```

AMM TRANSCRIPTION SERVICE - 631.334.1445

1    under their claim in this case, that's when you

2    breached.  They don't need an entire file about

3    every communication we've ever had with them, going

4    back years and years before we even entered into a

5    relationship with Legal Recovery Associates.

6            So we don't think it's reasonably

7    tailored.  We don't think a lot of it is relevant,

8    and we don't think it's necessary for the case.

9            THE COURT:  Explain the part you said

10   earlier where you don't want Mr. Solomon's client to

11   get information about your law firm's settlements on

12   behalf of -- in the personal injury cases.

13           MR. BRENES:  Yeah.  So they've requested

14   every financial record we have relating to any

15   litigation case going back in perpetuity.  So things

16   that have no relevance to this case that are

17   confidential, that they have no right to, they

18   shouldn't be getting.

19           THE COURT:  So let's roll back the tape a

20   little bit.  It's been a while since I looked at the

21   terms of your agreement with Legal Recovery

22   Associates, but isn't there a clause in there that

23   says they have the right to be paid whenever you

24   settle a lawsuit?

25           MR. BRENES:  It's an ambiguous clause,

1   but it could be interpreted that way.  The question

2   is, is it when the whole litigation settles or every

3   single time?

4           THE COURT:  What do you mean, the whole

5   litigation?

6           MR. BRENES:  So there'll be, like, a

7   hernia mesh litigation that -- does that mean --

8           THE COURT:  You bring these as what, mass

9   actions?

10          MR. BRENES:  Yes.  So the point being is

11  that applies to particular cases once we entered an

12  agreement with them.  They're seeking to go much

13  farther back in time than what they're requesting

14  from Counsel Financial.

15          Two, that's not what their claim was

16  based on.  Their claim was based on that once you

17  entered into an agreement with Counsel Financial --

18  or, I'm sorry, California Attorney Lending --

19          THE COURT:  California Attorney Lending.

20          MR. BRENES:  -- you breached.  That's

21  what their case was based on.  And so my position --

22          THE COURT:  Well, that was the basis of

23  the default letter that they sent you.

24          MR. BRENES:  So our position is -- so you

25  should get information as to that, and we're happy

AMM TRANSCRIPTION SERVICE - 631.334.1445

```
 1    to provide information as to when the first case is
 2    settled that would have been subject to this
 3    agreement.  But you don't need every settlement that
 4    ever happened with our firm, because you're talking
 5    about substantial records, substantial confidential
 6    information that they don't need, and it's not
 7    necessary for this case.  And those are covered by
 8    confidentiality agreements with the defendants, too,
 9    which is an issue.
10         THE COURT:  Well, confidentiality
11    agreements with the defendants are not binding on me
12    for discovery purposes, as I think you well
13    understand.  And when you enter into a financing
14    agreement with a lender where certain things are
15    triggered by your settlements, you have to realize
16    that your lender may require information about those
17    settlements.  They may not just take your word for
18    it.
19         MR. BRENES:  And that's fine if you limit
20    it to those settlements that may apply to this case
21    or may have triggered a breach.  But they don't need
22    to know -- there's no question they're claiming the
23    breach occurred once we entered in the agreement
24    with California Attorney Lending, right?
25         So we're fine with disclosing, hey, look,
```

1    were there settlements prior to that that could have

2    been an issue here?  That's fine.  But they need

3    information on every settlement we've had since?  I

4    don't think that's reasonable because --

5              THE COURT:  Have you responded -- let's

6    get back to basics here.  When the plaintiff sends

7    you a document demand under Rule 34, you are

8    required to answer it in writing and with

9    specificity under Rule 34(b), I think.  And what you

10   are required to say in your written response after

11   you make a bunch of objections, you are required to

12   actually tell them category by category in your

13   response what you're willing to produce and what

14   you're not.

15             They shouldn't have to guess at what's

16   out there that they haven't seen.  So to give a very

17   simple example, hypothetically, let's suppose they

18   sent you a document demand saying, turn over all of

19   the settlement agreements that you have entered into

20   on behalf of your law firm's clients in hernia mesh

21   litigation from 2015 to the present.  And you might

22   object on various grounds, irrelevant, violates

23   privacy, et cetera, et cetera, et cetera.  But after

24   you get through doing all of that objecting, you

25   actually have to tell them what you are and aren't

1    willing to do.  You might say, for example, and,

2    therefore, we're not going to turn over any of our

3    underlying settlement documents.  Now at least he

4    knows where he is.  He can make a motion.  Or you

5    might say, we are willing to turn over our

6    settlement-related documents between this date and

7    this date because they may potentially be relevant

8    to the present information, but we are refusing to

9    turn over our settlement-related documents prior to

10   this date or after that date.

11         What your actual response is, obviously,

12   is up to you, and then ultimately in the case of a

13   motion, up to me.  But I do want to impress upon you

14   now, just in case this is going to turn out to be an

15   issue, that when it comes to me in the form of a

16   motion, I don't want to be guessing as to where

17   you've actually drawn the line and what it is that

18   you have refused to produce.

19         You need to make that abundantly clear in

20   your written Rule 34 response.  And if you haven't,

21   you need to make it abundantly clear in the meet and

22   confer process so that neither your opponent nor the

23   Court is guessing as to where the party has drawn

24   the line before the motion gets made.

25         Am I coming through loud and clear?

```
 1              MR. BRENES:  I think that's very helpful,
 2    Your Honor, for both parties, because I was going to
 3    raise some concerns as well.
 4              THE COURT:  If it's a problem on the
 5    other side, then yes, of course, this applies to all
 6    parties.  They changed Rule 34.  They amended Rule
 7    34 to make -- to build this requirement in at the
 8    end of 2015, and yet it seems like not every corner
 9    of the Bar has yet gotten the message.
10              I still look at a lot of discovery
11    disputes where I see a Rule 34 response, and people
12    say things like, I object to document request number
13    five on this ground, this ground, this ground, this
14    ground.  Notwithstanding my objections, I have
15    produced 100 documents Bates-labeled 25 through 125.
16    That doesn't help.  And that doesn't satisfy the
17    rule, which is designed to make sure that the
18    opposing party, and then later the Court,
19    understands what the algorithm is that you're using,
20    so to speak, what line you're drawing, okay.
21              All right.  Now, do you want to briefly
22    touch on depositions?
23              MR. BRENES:  I do.  So Mr. Berger is a
24    gentleman they've agreed that they will produce for
25    deposition.  He's an agent for the company.  He's
```

1    not an officer or apparently a decision-maker, which

2    is -- what we've been told is that he's just an

3    agent.

4              THE COURT:  Is he an employee?

5              MR. BRENES:  I don't believe so from the

6    discovery responses I've seen from Legal Recovery

7    Associates.  He appears to be just an agent of the

8    company.

9              THE COURT:  But he is the guy you were

10   primarily dealing with?

11             MR. BRENES:  Him and another gentleman by

12   Greg Goldberg.  But those -- Howard and Greg were

13   the primary points of contact, Howard being the most

14   important.  And we certainly want Mr. Berger.  But

15   we do believe he clearly, as just a consultant,

16   which is what they appear to be claiming he was, he

17   would have been reporting back to the, you know, the

18   main people at this company explaining, you know,

19   presumably whether or not I requested to pay off

20   these loans and whether or not -- why were they

21   refusing to give the information if my claims are

22   true.  I believe there will be important

23   communications that these two other gentlemen --

24             THE COURT:  So you think maybe he was the

25   messenger and other people were making decisions?

```
 1                    MR. BRENES:  Yes.
 2                    THE COURT:  Okay.  So let me give you a
 3      little bit of guidance in the case of the
 4      depositions.  This may save you some time.
 5                    The presumptive limit is ten depositions
 6      per side.  We are obviously well short of that.  For
 7      a party to seek three depositions in a case
 8      involving a few million dollars, as this case does,
 9      does not strike me as disproportionate or
10      unreasonable.
11                    However, since it is clear both of you
12      agree that the majority of the communications were
13      with Mr. Berger, I think it would be reasonable for
14      you to start with Mr. Berger and then reassess
15      whether -- and for how many hours you need either of
16      the other two.  I don't want you to churn the same
17      issues over and over again, or start with someone
18      that you may turn out not even to need.  Because
19      maybe it will turn out that Mr. Berger was a
20      decision-maker.  Maybe he'll tell you, I did this
21      all on my own, I didn't even talk to these guys.
22      You want to know that before you start taking up
23      other people's time; okay?
24                    What else should we do today, gentlemen?
25                    MR. SOLOMON:  I would like to just return
```

1    to one issue because I just think it's important to
2    appreciate what the issues are in the case under
3    liability.  I get that for the two promissory notes
4    in this case, that we could establish a breach based
5    on the loan and the security interest to California
6    Lending.
7              THE COURT:  In which case all of the
8    damages that you would want to collect flow from
9    that point.
10             MR. SOLOMON:  From -- yes.  I mean, we
11   could talk about when the -- yes, for purposes of
12   calculating extra half percent of default interest,
13   sure.  But the guarantee agreement has a Bad-Boy
14   trigger, and a mere default doesn't trigger the
15   guarantee agreement.  There are other things that we
16   have to show.  For example, if the guarantor misuses
17   money, misappropriates money that should be paid to
18   the lender and pays it to somebody else.
19             THE COURT:  Like another lender, for
20   example?
21             MR. SOLOMON:  Like another lender, that
22   that could be a trigger.  And Mr. Brenes's counsel
23   has said at this hearing, oh, you know, the
24   guarantee is different, it's not unlimited and
25   there's other triggers.  So these triggers all are

1    Bad-Boy-type clauses which require a more searching
2    analysis than the mere fact of a breach.
3              THE COURT:  Well, but are you entitled to
4    do it retroactively?  Are you entitled to search now
5    for Bad-Boy triggers that you were unaware of at the
6    time?
7              MR. SOLOMON:  No, I'm aware of the
8    Bad-Boy triggers right now.  I just want the
9    documents to prove it.  In other words, to show the
10   willfulness and the intention to violate our rights,
11   which is exactly -- you know, we don't have the
12   state of mind information, but I'm pretty sure about
13   what happened.  But that's one thing.  But then the
14   other thing is we do have these other six notes.
15             THE COURT:  In the other case?
16             MR. SOLOMON:  Yeah.  And, you know, let's
17   be straight about it.  I mean, those other six notes
18   are not triggered by the granting of the security
19   interest.  They are triggered by the use of
20   proceeds.  The violation of the Use of Proceeds
21   Clause.
22             THE COURT:  Are there guarantees or no
23   guarantees on the other six notes?
24             MR. SOLOMON:  There's no guarantees.
25             THE COURT:  So that just goes against the

1    law firm.  And the argument there would be that

2    you're entitled to see payments that were made to

3    California Attorney Lending with respect to those

4    notes because those payments should have been made

5    to you.

6            MR. SOLOMON:  The definition of -- in the

7    triggering clause for payments under the promissory

8    note in the second case.

9            THE COURT:  Yeah, I do have a

10   recollection.  It's vague.

11           MR. SOLOMON:  "If either receives payment

12   of any award in respect of all product liability

13   litigation, whether result of judgment, settlement

14   or otherwise."  It couldn't be clearer.  So that's

15   why we're asking for -- and that's also a default,

16   by the way, under the original note.

17           So if somehow the security interest issue

18   was somehow deflected, it hasn't been conceded as a

19   default, but if somehow they got out of the default

20   there, I have these ancillary basic grounds for

21   establishing a default.

22           THE COURT:  Okay.

23           MR. SOLOMON:  But clearly collecting

24   money is a default, and then not paying the money to

25   us is a default.

1              THE COURT:  Okay.  I understand your

2      positions.  We've gone a little bit beyond the

3      Reader's Digest version here.  That's okay.  But I

4      want to repeat what I said earlier.  Nobody has a

5      motion before me at the moment, and you obviously

6      have not done any serious meeting and conferring on

7      this issue.

8              I think Mr. Brenes is now well aware of

9      what the landscape is.  He understands that he is

10      going to have to give some thought to what his

11      position is, and he's probably going to have to

12      clarify his position in terms of documents that he

13      hasn't produced because he doesn't have them versus

14      documents that he hasn't produced because he doesn't

15      think he should have to produce them.

16              And he has to give some thought -- I'm

17      not going to hold you, by the way -- you told me

18      here in open court a few minutes ago that you are

19      going to withdraw your claim on the double interest

20      accrued.  You can do that.  You should put that in

21      writing, if you want to do that.  But I think what

22      you've heard today will suggest to you that it may

23      not solve your problem.

24              Mr. Solomon has lots of other theories as

25      to why he's entitled to substantial discovery into

AMM TRANSCRIPTION SERVICE - 631.334.1445

1    your firm's financial relationship with California

2    Attorney Lending.  So you need to make that

3    strategic decision.  You need to meet and confer.

4    You may need to amend your written response.

5            Mr. Solomon, I have no idea whether your

6    written response is up to snuff or not, but take a

7    look at it.  You may need to amend yours as well.

8    And I expect I'll probably see a motion at some

9    point.

10            Is there anything further for us to do

11   today?  Shall I just wait around until I see a

12   motion come in?

13            MR. BRENES:  Your Honor, you had

14   indicated there were two thoughts of what we should

15   do going forward.  Should we look at the discovery

16   cutoff timeline or should we look at an accelerated

17   motion practice?

18            THE COURT:  Well, I don't know that it

19   would be accelerated.  I mean, that's up to you

20   guys.  Once I get it -- discovery disputes don't

21   take a long time here typically.

22            Once I get a discovery letter

23   application, the opposition letter is due in four

24   days, four business days.  The reply letters due two

25   business days after that.  If I can act on it based

1   on the letters, I will.  If I need you to come in

2   for a conference and hear more argument, we'll do

3   that, typically, relatively quickly.  It's rare in

4   this district that discovery disputes go to formal

5   notice motions.  We either resolve them on the

6   letters, or we resolve them at or shortly after the

7   conference.

8          And in connection with that motion, I can

9   consider whether and to what extent I need to push

10  out the discovery deadline.  I am loathed to, let's

11  say, give you an extra 30 days today, not knowing

12  what you're going to be able to work out, what

13  you're going to need to resolve by motion and so on.

14         MR. BRENES:  And I appreciate that, Your

15  Honor.  My point was more with if the other case

16  gets consolidated, you know, there may be a request

17  for extension of this discovery schedule.

18         THE COURT:  I understand that.  If the

19  other case gets consolidated, somebody is going to

20  put their hand up and say, we need four months and

21  let's just make it four months for both cases

22  together, and now we all have more breathing room.

23         MR. BRENES:  Understood.

24         THE COURT:  That hasn't happened at the

25  moment.

AMM TRANSCRIPTION SERVICE - 631.334.1445

1          MR. BRENES:  Understood.

2          THE COURT:  So I'm not sure there's a

3    whole lot more we can do today.  I had hoped that

4    more would have been done by today, but we are where

5    we are.

6          Anything further I can do for you, Mr.

7    Solomon?

8          MR. SOLOMON:  No, thank you.

9          THE COURT:  Mr. Brenes?

10          MR. BRENES:  No, Your Honor.

11          THE COURT:  All right.  So I'm not doing

12    anything today.  I'm not issuing any orders.  I'm

13    not extending the discovery deadline.

14          I will reiterate to both of you that you

15    don't have much time within the current deadline.

16    So if you are going to make a motion to compel or

17    for a protective order, and if you are going to

18    couple that motion with a motion to extend the

19    discovery deadline to accommodate a resolution of

20    that dispute, don't do that on August the 26th,

21    after the discovery deadline has expired.  Do that

22    in a timely fashion.

23          My law clerk is asking me if I'm going to

24    schedule another status conference, which I often do

25    in a situation like this, but I am so confident that

```
1    I'm going to get a motion from you within the next
2    couple of weeks that I don't feel the need to do
3    that.  We will take that up when I next hear from
4    you.
5                 So we will be adjourned.
6                 MR. SOLOMON:  Thank you.
7                 MR. BRENES:  Thank you, Your Honor.
8
9                          0o0
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1
 2                  C E R T I F I C A T E
 3
 4      I, Adrienne M. Mignano, certify that the
 5  foregoing transcript of proceedings in the case of
 6  Legal Recovery Associates v. Brenes Law Group, P.C.,
 7  et al.; Docket #22CV1778 was prepared using digital
 8  transcription software and is a true and accurate
 9  record of the proceedings.
10
11
12  Signature    Adrienne M. Mignano
13                ADRIENNE M. MIGNANO, RPR
14
15  Date:        October 3, 2023
16
17
18
19
20
21
22
23
24
25
```