## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

LEGAL RECOVERY ASSOCIATES LLC

   *Plaintiff,*

 -against-

BRENES LAW GROUP, P.C. AND TROY A.
BRENES

   *Defendants,*

_____

BRENES LAW GROUP, P.C. AND TROY A.
BRENES

   *Counterclaim Plaintiffs*,

 vs.

LEGAL RECOVERY ASSOCIATES LLC;
HOWARD B. BERGER, GREGORY GOLBERG;
GARY PODELL; LAWRENCE LITIGATION
GROUP, LP, and DOES 1-50

   *Counterclaim Defendants,*

_____

**Case No. 22-cv-1778 (ER) (BCM)**

**DEFENDANT'S OPPOSITION TO
PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT**

## TABLE OF CONTENTS

I.      INTRODUCTION……………………………………………………1

II.     FACTUAL HISTORY………………………………………………1

    a.  The Promissory Notes……………………………………………………1
    b.  LRA Blocks BLG's Ability To Repay Notes………………………………3
    c.  BLG Signs Agreement for Line of Credit With CAL………………………6
    d.  Acceleration………………………………………………………………6

III.    LEGAL ARGUMENT………………………………………………7

    a.  Standard………………………………………………………………7

    b.  A Reasonable Trier of Fact Could Conclude That BLG has Not Breached
        Notes 3 through 7 Under Principles of Contract Interpretation…………8

    c.  A Reasonable Trier of Fact Could Find LRA Breached It's Duty of Good
        Faith and Fair Dealing………………………………………………9

    d.  A Trier of Fact Could Reasonably Find that LRA Breached the
        Contract,[1] Interfered with BLG's Ability to Perform Under the Contract,[2]
        Acted in Bad Faith,[3] Made it Impossible for Plaintiff to Perform,[4] And Failed
        to Mitigate Its Damages[5]………………………………………………15

    e.  A Reasonable Trier of Fact Could Find That BLG Appropriately
        Tendered………………………………………………………….. 16

    f.  There Are Disputes of Material Fact As to Whether Brenes is Personally
        Liable on the Personal Guarantee………………………………………18

IV.     CONCLUSION……………………………………………………22

---

[1] Second Affirmative Defense.
[2] Fourth Affirmative Defense.
[3] Seventh Affirmative Defense.
[4] Fifth Affirmative Defense.
[5] Third Affirmative Defense.

TABLE OF AUTHORITIES

## Cases

*. Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)................7

*. Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 83 (2d Cir. 2004)................7

*511 W. 232nd Owners Corp.*, 98 N.Y.2d at 153, 773 N.E.2d at 501 ........................................12

Ace Wire & Cable Co., Inc. v. Aetna Casualty & Surety Co., supra, 60 N.Y.2d, at 398, 469 N.Y.S.2d 655, 457 N.E.2d 761 ............................................................................................................................8

Album Realty Corp. v. American Home Assurance Co., 80 N.Y.2d 1008, 1010, 592 N.Y.S.2d 657, 607 N.E.2d 804 ...................................................................................................................................8

Bank of N.Y. Mellon *Tr. Co. v. Morgan Stanley Mortg. Capital, Inc.*, 2017 U.S. Dist. LEXIS 20788 at *2 (S.D.N.Y. Feb. 10, 2017) ................................................................................................................16

Bird v. St. Paul Fire & Mar. Ins. Co., 224 N.Y. 47, 51, 120 N.E. 86] .....................................................8

*Canterbury Realty & Equip. Corp. v Poughkeepsie Sav. Bank*, 135 AD2d 102, 107 (3d Dept 1988])......15

*Canterbury Realty & Equipment Corp. v. Poughkeepsie Sav. Bank*, 135 A.D. 2d 102, 524 N.Y.S. 2d 531, 533 (N.Y. App. Div. 1988) ........................................................................................................19

*Carlone v. Lion & the Bull Films, Inc.*, 861 F. Supp. 2d 312, 322 (S.D.N.Y. 2012)..................................22

*Castellano v. State of New York, 43 N.Y. 2d. 909, 911 (1978)* .................................................................9

*Catlin v. Sobol*, 93 F.3d 1112, 1116 (2d Cir. 1996)..................................................................................8

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986) ......................7

citing Porto Rico v. Title Guaranty & Surety Co., 227 U.S. 382, 389 (1913) ...........................................21

*Croford v. Bank of Am.*, 2009 WL 10670700, at *3 (C.D. Cal. Feb. 4, 2009)..............................................12

*Dalton v. Educational Testing Serv.,* 87 N.Y.2d 384, 387 (1995) ............................................................9

*George Twon Assocs. S.A. v. Abakan, Inc.,* No. 15 CV3435 DLC, 2015 WL 4923040, at *10 (S.D.N.Y Aug. 18, 2015) ......................................................................................................................................17

*Grace v Nappa*, 46 NY2d 560, 567 (1979)...............................................................................................15

*H & A Realty Assoc. LLC v LCP NPL 6 2018 LLC, 2020 N.Y. Misc. LEXIS 2879, N.Y. Slip. Op.* 31978(U)(Queens Co. Sup. Ct. May 8, 2020) ........................................................................... 12, 16

*M/A-COM Sec. Corp. v. Galesi*, 904 F.2d 134, 136 (2d Cir. 1990)................................................11, 16, 17

Martinez v. Planet Home Lending, 2022 Cal. Super. Lexis 21591 at **10-13, No. 21STCV04393, (Cal. Sup. Court March 9, 2022) ......................................................................................................................18

*Millgard Corp. v. E.E. Cruz/ Nab/ Frontier-Kemper*, 2002 U.S. Dist. LEXIS 23921 at *47 (S.D.N.Y. Dec.12, 2002), *summ. judg. granted*, 2003 U.S. Dist. LEXIS 20928 (S.D.N.Y. Nov. 18, 2003)...........22

*Murphy v American Home Prods. Corp.,* 58 N.Y.2d 293, 304 (1983) .........................................................9

*Nextbridge Arc Fund, LLC v. Vadodra Property*, LLC, 31 Misc. 3d 1202A, 929 N.Y.S.2d 201, 2011 WL 1124347, at * 2 (Sup. Ct. N.Y. 2011) ..........................................................................................22

*Optima Media Grp. Ltd. V. Bloomberg L.P.*, No. 17-CV-01898 (AJN), 2021 WL 1941878, at *16 (S.D.N.Y. May 14, 2021)...........................................................................................................11

*Preferred Group of Manhattan, Inc. v. Fabius Maximus, Inc.*, 51 AD3d 889, 859 N.Y.S.2d 236 (2d Dept 2008) .............................................................................................................................................. 13, 16

*Ray Legal Consulting Grp. V. DiJoseph*, 37 F. Supp. 3d 704, 726 (S.D.N.Y 2014) ..................................11

*Red Tulip, L.L.C. v. Neiva*, 44 A.D. 3d 204, 211-212, 842 N.Y.S.2d 1, 7 (N.Y. App. Div. 2007)............19

*Renegade Tech. Group, Inc. v. Pali Capital, Inc.*, 2011 Ariz. App. Unpub. LEXIS 1605 **19-20, 2011
    WL 6885992 (Dec. 29, 2011) ................................................................................ 19

*Reznick v. Bluegreen Resorts Mgt., Inc.*, 154 AD3d 891, 62 N.Y.S.3d 460 (2d Dept. 2017).................... 15

*Rowe v Great Atl. & Pac. Tea Co.*, 46 N.Y.2d 62, 69 (1978)......................................................... 9

*Smith v General Acc. Ins. Co.*, 91 N.Y.2d 648, 652-653, (1998) ................................................... 9

Uribe v. Merchants Bank of New York, 91 N.Y.2d 336, 341–42, 693 N.E.2d 740, 743 (1998)................. 8

*Vacold, L.L.C. v. Cerami*, 545 F.3d 114, 121 (2d Cir. 2008)......................................................... 7

*Walcott v. Clevite Corp.*, 13 NY2d 48, 55-56, 191 NE2d 894, 241 NYS2d 834 (1963) ........................... 22

## Statutes

FED. R. CIV. P. 56(c) ...................................................................................................... 7

Section 3-603 of the Uniform Commercial Code .......................................................... 17, 18

## Treatises

5 Williston, Contracts § 1293, at 3682 (rev. ed. 1937) ..................................................... 9

*Kirke La Shelle Co. v. Paul Armstrong Co.*, 263 N.Y. 79, 87, 188 N.E. 163, 167 (1933).................... 10

Williston on Contracts § 64:27 (4th ed. 2015)............................................................... 16

## I.    INTRODUCTION:

The issue presented is whether Legal Recovery Associates (LRA) has met its burden of establishing a prima facie case and whether reasonable trier of fact could find in Defendants' favor on material issues of fact.

## II.    FACTUAL HISTORY
### a.  The Promissory Notes

On or about July 9, 2019, Brenes Law Group, P.C. entered into a Promissory note with LRA in the amount of $1,100,000 (Note 1). Troy Brenes executed a personal guarantee relating to this first Note. See, Ex. 9 to Solomon Decl. BLG entered into a second promissory note with LRA on or about September 12, 2019 in the amount of $500,000.

BLG thereafter entered into several additional promissory note agreements with LRA as follows:

| Approximate date | Amount | Note Nos. |
|---|---|---|
| December 9, 2019 | $500,000 | 3 |
| March 5, 2020 | $250,000 | 4 |
| June 5, 2020 | $200,000 | 5 |
| August 6, 2020 | $150,000 | 6 |
| August 31, 2020 | $150,000 | 7 |
| October 13, 2020 | $150,000 | 8 |

Interest on Notes 1 though 8 accrue at the annual rate of 17.5%. Exs. 1-8 to Solomon Dep'n. In the event of a default, interest would accrue at the annual default rate of 18%. *Id.* Notes 1 and 2 include a footnote advising the drafter to "[c]onsider specifying [the] applicable day-count convention for interest accrual." Exs. 1-2 to Solomon Dep'n. The applicable day-count convention is not specified in any of the Notes. Exs. 1-8 to Solomon Dep'n. Each of the Notes, 1 through 8, provide that BLG will repay LRA the principal and accrued interest on the Payment Date, defined as "the date on which [BLG] receives payment of any award in respect of all product liability litigation, whether as a result of judgment, settlement, or otherwise." *Id.*

Notes 1 and 2, include a provision The Notes are collateralized by all of BLG's "right, title and interest in, to and under" "all proceeds, receivables, property, cash and other consideration payable to [BLG] . . . in connection with" what the Notes call the "Case" (defined to mean "all product liability litigations represented by Brenes Law Group, PC"), whether BLG receives these payments "as a result of judgment, settlement or otherwise." Solomon Dep'n Ex. 1-2. Notes 1 and 2 also required BLG represent, warrant, and covenant that the collateral would be "free and clear of any lien, security interest, option, or other charge or encumbrance except those. . . created by [each] Note." *Id.* Notes 3 through 8 do not contain these clauses contained in this paragraph. *Id.,* Exs. 3-8.

Each Note also contains an acceleration clause permitting LRA to demand the full amount due and all interest accrued "immediately on the occurrence or existence of "an Event of Default." *Id.,* Exs. 1-8. The Notes also contain a prepayment clause, permitting BLG to prepay them "either in whole or in part, without any prepayment fee or penalty," so long as the payment is made "in lawful money of the United States of America, which, at the time of payment, is

legal tender for the payment of public and private debts therein." *Id.* LRA has not claimed that

the Guarantee signed by Brenes on July 9, 2019 applies to loans numbers 3-9.

### b. LRA Blocks BLG's Ability To Repay Notes

In 2016, BLG entered into an Attorney Association Agreement with a lawfirm by the

name of Lawrence Litigation Group in 2016, which contemplated that the two law firms would

collaboratively pursue certain types of personal injury actions and share the associated fees and

costs.

In early 2019, Berger and Goldberg suggested that BLG "shift its line of credit

from California Attorney Lending II, Inc (CAL) to a third-party lender to LRA. BLG agreed to

do so, which resulted in Notes 1 through 8. LLG ultimately breached the Association Agreement

by refusing to contribute its share of the expenses for the personal injury actions the firms were

pursuing together.

BLG, concerned that LRA would withhold future funding as way to inhibit BLG from

challenging LLG's breach of the Attorney Association Agreement, reached out to its prior lender

CAL, to arrange a new line of credit to repay the entire debt owed to LRA," including all accrued

interest on Notes 1 through 8.

CAL agreed to fund the loan, including repayment of all amounts owed to LRA under the

Notes so long as BLG could obtain a "Payoff Letter" from LRA which confirmed the total

amount owed, the per diem amount being accrued daily, wiring instructions, that any UCC filed

would be withdrawn, and that all debts owed to LRA pursuant to the Notes would be resolved

once the confirmed payment amount was made.

Thus, on July 25, 2020, Troy Brenes emailed Howard Berger and George Lui, both of

whom worked for LRA, and indicated that BLG had arranged another line of credit for BLG,

which required that all amounts owed under any promissory notes taken by BLG from LRA be repaid.

The July 25, 2020, communication from Troy Brenes to Howard Berger and George Lui also notes that the new loan provider required LRA to complete an attached letter which required identification of the total payoff amount due under the promissory notes, the per diem interest amount that was accruing, wiring instructions, and acknowledgement that any UCC filing based on the promissory notes would released. The attachment to the July 25, 2020 email communication notes that "If you are unable to process this request for any reason, or if you have any questions, please contact Megan Payne at 800-820-4430.

On July 25, 2020, Berger responded that LRA conditioned its willingness to provide the requested information and the request Payoff Letter on BLG agreeing to give concessions regarding the Attorney Association Agreement between BLG and LRA. Brenes immediately as follows:

> The letter only relates to Legal Recovery Associates and the loans BLG took from that entity that BLG could use for any case. The co-counsel arrangement with LLG and LLG's right to reimbursement for contributions are not affected by that letter in any way. There is nothing different from BLG previously had counsel financial as a loan provider. I cannot give away LLG's interest in any cases as LLG is a separate entity than BLG and nothing in that letter suggests otherwise.

(SOF 61).

Thereafter, Brenes and Megan Payne and Steve Mingle from CAL made numerous efforts to follow up with Howard Berger and George Lui to obtain the Payoff letter and the information necessary to repay all debts owed under the Notes. However, Howard Berger on behalf of LRA refused to agree to Payoff letter or provide the other necessary information.

LRA refused to offer any alternative to the proposed payoff letter until October 12, 2020, nearly three months after Plaintiff made the request to pay off the debt, and LRA proposed language made clear that LRA would still only agree to a Payoff letter if BLG agreed to include language that Attorney Association Agreement between BLG and LLG was valid and enforceable.

When LRA refused to provide a payoff letter that did not also validate the Association Agreement, BLG's third-party lender, CAL, agreed to dispense with the requirement of a payoff letter. At that point – on or about October 28, 2020 – BLG informed LRA that all [it] needed to pay off all debts owed by BLG to LRA was the current amount owed and the account information necessary to wire the money.

However, for the next three months – until January 6, 2021 – LRA refused to disclose the amount owed or the relevant account information so that BLG could pay off the debts owed to LRA pursuant to all promissory notes. On January 6, 2021 LRA finally provided wiring instructions. No explanation was ever given why it refused to do so from July 28 2020 through January 5, 2021.

LRA did provide any "Interest Schedule" on August 4, 2020 which provided alleged amounts owed for Notes 1 through 5. However, it did not provide payment information for Note 6 (August 6, 2020), Note 7 (August 31, 2020), or Note 8 (October 13, 2020). LRA refused to provide payment information sufficient to repay all debts owed under all notes until January 6, 2021. LRA has never offered an explanation for why it refused to do so. LRA's calculation provided on January 6, 2021, made clear that it was demanding payment of all interest that had accrued on all Notes from August 2020 through January 5, 2021.

Brenes Spoke with Owen Cyrulnik on several occasions in early March 2021. Owen represented that he was acting as a representative for LRA. Brenes noted that BLG was ready and willing to repay all debts owed on the Notes but would not agree to pay interest on the time period for when LRA acted in Bad faith the prevent repayment. Owen indicated that LRA insisted on repayment of all interest accrued through the present.

### c. BLG Signs Agreement for Line of Credit With CAL

On October 27, 2019, BLG signed a line of credit with Cal at a 15.5% interest rate and 1% loan origination fee. Approximately $3,400,0000 was set aside as the amount that was believed to be sufficient to accommodate any amount LRA may ultimately claimed it was owed under the Notes. The agreement granted a security interest as collateral to CAL in a portion of the proceeds from BLG's cases. In December 8, 2020, BLG may the first payment to CAL on a "product liability" case that otherwise would have triggered repayment of all 8 Notes between BLG and CAL. The attorney fees BLG earned on the case was $59,000 and the payment to CAL was $27,102.74 in attorney fees. From February 2021 through July 2021, BLG earned another $100,945.06 in attorney fees. Of which 50% was paid to CAL.

### d. Acceleration

On January 21, 2022, LRA sent an email to Brenes stating that it was exercising its right to accelerate funding under loans 1 and 2 because it was aware that in October 2020 BLG "executed a financing transaction pursuant to which it granted a third-party lender a general security interest in its assets as collateral for the borrowing." The letter further stated that unless BLG paid $1,589,424.66 on loan 1 and $706,643.84 on loan 2 in three days, LRA would file a lawsuit against BLG (on the Notes) and Brenes (the Guarantor), seeking principal, accrued interest to the date of default, penalty interest at the rate of 20% per annum, and costs and

attorneys' fees. Notably, LRA's demand for a 20% penalty interest rate was 2% higher than was allowed by Loans 1 and 2 in the event of default. LRA provided wiring information for its account.

On February 24, 2023, LRA demanded full repayment on loans 3 through 8 because it alleged, *inter alia*, BLG had received payment on one or more product liability cases. Wire instructions were provided.

## III.    LEGAL ARGUMENT
### a.  Standard

Summary judgment is appropriate where the evidence, viewed in the light most favorable to the non-moving party, shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *Vacold, L.L.C. v. Cerami*, 545 F.3d 114, 121 (2d Cir. 2008). The burden rests upon the moving party to show that there is no genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). A fact is "material" only where it will affect the outcome of the suit under governing law. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). For there to be a "genuine" issue about the fact, the evidence must be such "that a reasonable jury could return a verdict for the nonmoving party." *Id*. In determining whether there is a genuine issue of material fact, the Court is required to resolve all ambiguities and draw all inferences in favor of the non-moving party. *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc*., 391 F.3d 77, 83 (2d Cir. 2004). Where there is no evidence in the record "from which a reasonable inference could be drawn in favor of the non-moving party on a material issue of fact," summary judgment is proper. *Catlin v. Sobol*, 93 F.3d

1112, 1116 (2d Cir. 1996). The nonmoving party can defeat summary judgment by presenting evidence sufficient to create a genuine issue of material fact.

### b. A Reasonable Trier of Fact Could Conclude That BLG Has Not Breached Notes 3 through 7 Under Principles of Contract Interpretation

The Notes all provide that the date on which BLG receives payment of any award in respect of all product liability litigation, whether as a result of judgment. LRA appears to urge that Notes 3 through 7 should be read such that full repayment of all loans and all interest was required as soon BLG recovered any amount in any product liability case. Thus, when BLG received $59,000 in attorney fees on a product liability case in November 2019, LRA appears to contend that BLG was required to immediately repay all 8 notes in full. LRA leaves unexplained how BLG could have paid the same $59,000 to each Note. BLG contends that interpretation would lead to an absurd result that was never the intention of the parties. BLG instead argues that this language should be construed as final payment be made on all Notes once "all" of BLG's retained product liability cases resolve.

In *Uribe v. Merchants Bank of New York, 91 N.Y.2d 336, 341–42, 693 N.E.2d 740, 743 (1998)*, the court held that " 'reasonable expectation and purpose of the ordinary business[person] when making an ordinary business contract' " serve as the guideposts to determine intent (*Album Realty Corp. v. American Home Assurance Co.*, 80 N.Y.2d 1008, 1010, 592 N.Y.S.2d 657, 607 N.E.2d 804 [quoting *Bird v. St. Paul Fire & Mar. Ins. Co.*, 224 N.Y. 47, 51, 120 N.E. 86] ). Thus, the "tests to be applied * * * are common speech * * * and the reasonable expectation and purpose of the ordinary business[person]," in the factual context in which terms of art and understanding are used, often also keyed to the level of business sophistication and acumen of the particular parties. *Ace Wire & Cable Co., Inc. v. Aetna Casualty & Surety Co., supra*, 60 N.Y.2d, at 398, 469 N.Y.S.2d 655, 457 N.E.2d 761. To carry

DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

out the intention of a contract, words may be transposed, rejected, or supplied, to make its meaning more clear. *Castellano v. State of New York, 43 N.Y. 2d. 909, 911 (1978).* Here, the purpose of the promissory notes from LRA was to allow BLG sufficient funds to litigate all of its product liability lawsuits with LRA knowing the loans would be repaid once Plaintiff had resolved the majority of its product cases. Currently, BLG has resolved far less than 20% of its product liability cases its represents.  As such, BLG should be deemed to have breach the Notes on the basis that it did not repay the Notes from the minority of product settlements it has completed to date. Furthermore, unlike Notes 1 and 2, granting a security interest in a portion of BLG's attorney fees in its cases to CAL is not a basis for breach in Notes 3 – 7.

### c. A Reasonable Trier of Fact Could Find LRA Breached It's Duty of Good Faith and Fair Dealing

In New York, all contracts imply a covenant of good faith and fair dealing in the course of performance. *Smith v General Acc. Ins. Co.*, 91 N.Y.2d 648, 652-653, (1998). This covenant embraces a pledge that "neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Dalton v. Educational Testing Serv.,* 87 N.Y.2d 384, 387 (1995). While the duties of good faith and fair dealing do not imply obligations "inconsistent with other terms of the contractual relationship," *Murphy v American Home Prods. Corp.,* 58 N.Y.2d 293, 304 (1983), they do encompass "any promises which a reasonable person in the position of the promisee would be justified in understanding were included." *Rowe v Great Atl. & Pac. Tea Co.*, 46 N.Y.2d 62, 69 (1978)(quoting 5 Williston, Contracts § 1293, at 3682 (rev. ed. 1937)). The implied covenant "embraces a pledge that 'neither party shall do anything which will have the effect of destrying or injuring the right of the other party to receive the fruits of the contract.'" *Dalton v. Educ. Testing Serv.,* 87 N.Y. 2d 384, 389, 663 N.E. 2d 289, 291 (1995)(quoting *Kirke La Shelle Co. v. Paul Armstrong Co.*, 263 N.Y.

79, 87, 188 N.E. 163, 167 (1933)). LRA claims a reasonable trier of fact could not find in BLG's favor because it alleges that it (1) did not interfere with Plaintiff's ability to repay the Notes, (2) that LRA is was allowed to interfere with BLG's rights to repay the Notes to try to leverage a benefit for a third party regarding a wholly separate agreement, (3) that the alleged breach was not material, and (4) BLG suffered no harm from LRA preventing BLG from repaying the notes as requested. Plaintiff disagrees.

The promissory notes provided that BLG could repay the loans at any time without penalty or limitation regarding the manner of repayment with the exception that it had to be in legal tender. The material benefit of these provisions to BLG was that the contract could be repaid at any time and in any manner that counted as legal tender in order to prevent further interest from accruing. These provisions also benefited BLG in that it allowed BLG the option to obtain alternative financing with better terms so long as LRA was repaid. BLG did in fact obtaining alternative financing from CAL that was 2% lower than interest accruing to LRA under the Notes.  Further benefits of shifting to a line of credit with CAL was that it allowed BLG to have certainty as to what its line of credit was for purposes of planning business operations, and not having to be concerned that LRA would withhold future funding if BLG challenged whether a third party, LLG, breached a separate Attorney Association Agreement. These were material benefits that BLG tried to exercise and LRA acted in bad faith to prevent BLG from doing so. Specifically, LRA improperly (1) demanded that terms be inserted into a payoff letter that had no relevance to the promissory notes or repayment thereof, but rather sought to force Defendants into improper concessions regarding a co-counsel relationship with a separate entity; (2) refused to confirm the amount owed under all Notes, (3) refused to disclose account information necessary for BLG to wire repayment in legal tender.

A reasonable person would be justified in expecting that LRA would agree to complete a Payoff Letter confirming the amount it believes it was owed, the daily per diem increase, wiring information, and confirmation that payment of whatever amount it claimed it was owed under the Notes would resolve all debts owed under said Notes – without LRA insisting the Payoff letter include concessions from BLG that a third party law firm was in compliance with a separate Attorney Association Agreement with BLG. Here, CAL required that BLG obtain such a Payoff letter from LRA before funding. Brenes and two members from CAL repeatedly sent Howard Berger proposed Payoff letters and followed up regarding same starting on July 28, 2020 and running through the end of October 2020. While LRA retroactively seeks to style this as good faith negotiations by LRA – it was not. Howard Berger on behalf of LRA refused to agree to any Payoff letter unless BLG agreed to give up its right to challenge whether a third party lawfirm was in breach of an Attorney Association Agreement. Moreover, LRA wasted months of BLG's time and caused BLG to continue incur substantial interest charges while BLG sent Payoff letter after Payoff letter to LRA, and LRA refused to provide complete payoff information or wiring instruction. Given Howard Berger's unreasonable conduct, CAL eventually agreed to dispense with the need for a Payoff Letter at the end of October.

LRA cites several cases for the proposition that it was entitled to refuse to provide a Payoff Letter because it is allegedly allowed to deprive BLG of the benefits of the material contracts terms in order to benefit a third-party law firm in a separate contractual dispute. See, *Ray Legal Consulting Grp. V. DiJoseph*, 37 F. Supp. 3d 704, 726 (S.D.N.Y 2014); *Optima Media Grp. Ltd. V. Bloomberg L.P.*, No. 17-CV-01898 (AJN), 2021 WL 1941878, at *16 (S.D.N.Y. May 14, 2021)(quoting *M/A-COM Sec. Corp. v. Galesi*, 904 F.2d 134, 136 (2d Cir. 1990). In other words, LRA argues it should be allowed to hold BLG hostage from being able to

repay it debts as allowed under the Notes in order to force concessions for a third-party in a separate contractual dispute. LRA's cited cases do not support this contention.

On October 28, 2020, BLG and CAL notified Howard Berger that the Payoff Letter was no longer required, and that BLG, through CAL, was ready to repay all debts owed to LRA under the Notes and that all LRA had to do was provide a confirmation of the total amount due under the Notes and account information so the payment could be wired. LRA refused to provide the wiring instructions or confirmation of the amount due until January 6, 2021. BLG and CAL had been requesting wiring instructions and confirmation of the total debt since July 28, 2020. LRA refusal to provide this information was done in bad faith.

The Notes gave BLG the right to prepay the entire balance at any time, without penalty, so long as payment was made "in lawful money of the United States of America, which, at the time of payment, is legal tender for the payment of public and private debts therein." Notes at 1. A dollar-denominated wire transfer is "legal tender," making it a permissible payment method under the Notes. *See Croford v. Bank of Am.*, 2009 WL 10670700, at *3 (C.D. Cal. Feb. 4, 2009) (rejecting the contention that "BofA's checks and wire transfers were not backed by coin or currency and were not legal tender but rather only BofA's credit"). Thus, a "reasonable person in the position of [BLG] would be justified in understanding" that payment could be made by wire. *511 W. 232nd Owners Corp.*, 98 N.Y.2d at 153, 773 N.E.2d at 501. Yet, LRA offers no explanation for why it refused to disclose information that would have allowed BLG to repay the Notes by wire util January 6, 2021. The courts have recognized that failure to provide timely and accurate wiring instructions once requested on a note is a breach of contract. *See*, *H & A Realty Assoc. LLC v LCP NPL 6 2018 LLC, 2020 N.Y. Misc. LEXIS 2879, N.Y. Slip. Op*. 31978(U)(Queens Co. Sup. Ct. May 8, 2020)(holding that failure to timely provide wiring

instructions once requested, which resulted in increased amount owed on the note, represented a breach of contract); *Preferred Group of Manhattan, Inc. v. Fabius Maximus, Inc.*, 51 AD3d 889, 859 N.Y.S.2d 236 (2d Dept. 2008)(referee providently exercised his discretion in determining that the mortgagee not entitled collect interest at the default rate of 16% per annum, referee having properly considered the fact that the mortgagee's failure to provide a timely and accurate payoff letter prevented the mortgagor from making the final balloon payment]).

A reasonable person would be justified in expecting LRA to disclose the amount it believed was owed when the borrower sought to pay off the debt. First, while LRA did provide a an excel listing repayment amounts on August 4, 2020, the information did not account for Notes 6 through 8 ($450,000 principal + interest) that came after August 4. Moreover, there are multiple ways to determine how much interest had accrued and Notes and the August 4th excel spreadsheet were silent as to method to be applied to the amount owed under the Notes. Among the most common conventions are 30/360, 30/365, actual/360, actual/365, and actual/actual.[6] These approaches vary in the following ways:

- 30/360 - calculates the daily interest using a 360-day year and then multiplies that by 30 (standardized month).
- 30/365 - calculates the daily interest using a 365-day year and then multiplies that by 30 (standardized month).
- actual/360 - calculates the daily interest using a 360-day year and then multiplies that by the actual number of days in each time period.
- actual/365 - calculates the daily interest using a 365-day year and then multiplies that by the actual number of days in each time period.
- actual/actual - calculates the daily interest using the actual number of days in the year and then multiplies that by the actual number of days in each time period.

---

[6] See, https://www.investopedia.com/terms/d/daycount.asp.

The method used results in a substantial difference in the amount owed. Below is a table illustrating how the interest accrual method impacts the amount owed using the first promissory note amount and the same time frame used by LRA in its example:

| Date of Note | Principal | Payment Date | Interest Days | Interest Rate | Accured Interest | Payoff | METHOD |
|---|---|---|---|---|---|---|---|
| 7/8/2019 | $1,100,000 | 10/29/2020 | 479 | 17.50% | $ 252,623.29 | $ 1,352,623.29 | actual/365 days |
| 7/8/2019 | $1,100,000 | 10/29/2020 | 479 | 17.50% | $ 256,131.94 | $ 1,356,131.94 | actual/360 days |
| 7/8/2019 | $1,100,000 | 10/29/2020 | 479 | 17.50% | $237,328.77 | $1,337,328.77 | 30/365 |
| 7/8/2019 | $1,100,000 | 10/29/2020 | 479 | 17.50% | $240,625.00 | $1,340,625.00 | 30/360 |
| 7/8/2019 | $1,100,000 | 10/29/2020 | 479 | 17.50% | $252,188.11 | $1,352,188.11 | actual/actual |

Under these circumstances a reasonable person would expect LRA to disclose the final amount it alleged it was owed such that BLG could have certainty that the payment would resolve all debts under the Notes, and CAL would be willing to release the payment as no outstanding debts would be at issue under additional notes. However, LRA refused to provide confirmation of the total amount owed for four (4) months.

Lastly, LRA argues BLG suffered no harm. BLG disagrees. LRA intentionally delayed Plaintiff's ability to repay the Notes from July 28, 2020 until at least January 6, 2021. During that five (5) months period, BLG suffered harm in the form of a 2% higher interest rate (15.5% vs. 17.5%). Per LRA's excel spreadsheet provided in March 2021, on July 29, 2020 BLG owed $2,914,976.39, inclusive of interest, and on January 5, 2021 BLG owed $3,589,920.14, inclusive of interest. A 2% lower interest rate during this time frame would have equated to a reduction of $25,691.67 in interest charges as of January 5, 2021. BLG also alleges that any interest accrual

should have stopped once BLG stated it was ready to repay all debts it just required the wiring

information and confirmation of the final amount. BLG was also forced to incur a 1% loan

origination charge on the approximate $3,400,000 BLG reserved to account for any amounts that

may be owed to LRA under the Notes ($34,000.00). CAL required a reserve for any amount

potentially due LRA at least initially. By refusing disclose total amount owed and wiring

information despite numerous requests, LRA forced BLG into potentially being declared in

beach of the contract which carries an escalated 18% interest rate and a potential attorney fee

award.

   **d.  A Trier of Fact Could Reasonably Find that LRA Breached the
        Contract,[7]Interfered with BLG's Ability to Perform Under the Contract,[8]
        Acted in Bad Faith,[9] Made it Impossible for Plaintiff to Perform,[10] And
        Failed to Mitigate Its Damages[11]**

       As a rule, a material breach by one party to a contract may excuse another party's

performance. See *Grace v Nappa*, 46 NY2d 560, 567 (1979). Moreover, "[a] promisee who

prevents the promisor from being able to perform the promise cannot maintain suit for

nonperformance; he discharges the promisor from duty." *Canterbury Realty & Equip. Corp. v

Poughkeepsie Sav. Bank*, 135 AD2d 102, 107 (3d Dept 1988]). To establish a breach of contract,

plaintiff is required to show the existence of a contract, plaintiff's performance pursuant to the

terms of the contract, defendant's breach of the contract obligations, and damages resulting from

the breach. *Reznick v. Bluegreen Resorts Mgt., Inc.*, 154 AD3d 891, 62 N.Y.S.3d 460 (2d Dept.

2017). "[T]here exists under New York law an implied covenant of good faith and fair dealing,

---

[7] Second Affirmative Defense.
[8] Fourth Affirmative Defense.
[9] Seventh Affirmative Defense.
[10] Fifth Affirmative Defense.
[11] Third Affirmative Defense.

pursuant to which neither party to a contract shall do anything which has the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *M/A-COM Sec. Corp. v. Galesi*, 904 F.2d 134, 136 (2d Cir. 1990). "Damages which the plaintiff might have avoided with reasonable effort without undue risk, expense, burden, or humiliation will be considered either as not having been caused by the defendant's wrong or as not being chargeable against the defendant." Bank of N.Y. Mellon *Tr. Co. v. Morgan Stanley Mortg. Capital, Inc*., 2017 U.S. Dist. LEXIS 20788 at *2 (S.D.N.Y. Feb. 10, 2017)(citing Williston on Contracts § 64:27 (4th ed. 2015)). Defendant argues BLG cannot prove any of these defenses because it alleges there is no evidence hat LRA interfered with BLG ability to repay Notes. BLG disagrees. As discussed above, LRA intentionally and in bad faith prevented BLG from repaying the Notes by from July 28, 2020 through January 5, 2021 but refusing to provide a Payoff Letter unless BLG agreed to include language preventing BLG from alleging that LLG, a third party, breach a separate Attorney Association Agreement, refusing to provide wiring instructions, and refusing to confirm the payoff amount once Note 6 through 8 were added. *See*, H & A Realty Assoc. LLC v LCP NPL 6 2018 LLC, 2020 N.Y. Misc. LEXIS 2879, N.Y. Slip. Op. 31978(U)(Queens Co. Sup. Ct. May 8, 2020)(holding that failure to timely provide wiring instructions once requested, which resulted in increased amount owed on the note, represented a breach of contract); *Preferred Group of Manhattan, Inc. v. Fabius Maximus, Inc*., 51 AD3d 889, 859 N.Y.S.2d 236 (2d Dept. 2008)(referee providently exercised his discretion in determining that the mortgagee not entitled collect interest at the default rate of 16% per annum, referee having properly considered the fact that the mortgagee's failure to provide a timely and accurate payoff letter prevented the mortgagor from making the final balloon payment]).

LRA also cites two cases[12] for the proposition that a bad faith claim can only be maintained if the misconduct destroys the entire value of the contract, which it alleges was $3,000,000 in promissory notes. However, LRA fails to correctly cite the cases as they note a breach of the good faith duty implied in contracts is not limited to the value of the contract being destroyed but also applies where the parties' interest in the contract is injured. *Id.*

LRA also argues the failure to mitigate defense cannot apply LRA alleges that BLG is basing the claim on pre-breach conduct. BLG disagrees. LRA knew in October 2020 that BLG had moved forward CAL for a line of credit. To the extent LRA claimed this was a beach it should have raised these issues in 2020 instead of waiting until a year late.

### e. A Reasonable Trier of Fact Could Find That BLG Appropriately Tendered the Settlement Funds

Section 3-603 of the Uniform Commercial Code states the following regarding "Tender of Payment:"

(a) If tender of payment of an obligation to pay an instrument is made to a person entitled to enforce the instrument, the effect of tender is governed by principles of law applicable to tender of payment under a simple contract.

(b) If tender of payment of an obligation to pay an instrument is made to a person entitled to enforce the instrument and the tender is refused, there is discharge, to the extent of the amount of the tender, of the obligation of an indorser or accommodation party having a right of recourse with respect to the obligation to which the tender relates.

(c) If tender of payment of an amount due on an instrument is made to a person entitled to enforce the instrument, the obligation of the obligor to pay interest after the due date on the amount tendered is discharged. If presentment is required with respect to an instrument and the obligor is able and ready to pay on the due date at every place of payment stated in the instrument, the obligor is deemed to have made tender of payment on the due date to the person entitled to enforce the instrument.

---

[12] See, ECF Dkt. No. 97 p 20 (citing *George Twon Assocs. S.A. v. Abakan, Inc.,* No. 15 CV3435 DLC, 2015 WL 4923040, at *10 (S.D.N.Y Aug. 18, 2015); *M/A-COM Sec. Corp. v. Galesi,* 904 F.2d 134, 136 (2d Cir. 1990).

U.C.C. § 3-603.[13] In cases addressing claims of "Tender" through requests to pay by wire, courts have held a valid tender offer may be made where one offered to wire the funds due under the note, that they had the funds available and that the funds could have been wired had the wiring instructions been provided. *Martinez v. Planet Home* Lending, 2022 Cal. Super. Lexis 21591 at **10-13, No. 21STCV04393, (Cal. Sup. Court March 9, 2022).

In this case, BLG took all appropriate steps to tender the debt to LRA, which refused to accept it by refusing to provide wiring instructions. BLG repeatedly notified LRA that it was ready, willing and able to pay off the entire debt owed to LRA without any limitation or condition. BLG in fact had sufficient funds available to do so as BLG executed the line of credit with CAL on October 27, 2020 and reserved several million to account for any debts owed to LRA under the Notes. Per Defendants excel document provided on January 6, 2021, $3,489,295.14 had been due on October 28, 2020. All BLG asked for was confirmation of the final amount owed and account information so that all funds could be wired to LRA's account. LRA refused to respond as to the amount owed, wiring instructions, or any other instructions for where and how to repay the debt. BLG's alleged actions meet the requirements of tender, particularly in light of LRA's bad faith refusal to respond.  Therefore, any interest that accrued after October 28, 2020 should be capped as of that date. LRA cites cases that do not involve request to pay by wire where funds are currently available and are therefore are inapposite of this matter.

      **f.   There Are Disputes of Material Fact As to Whether Brenes is Personally Liable on the Personal Guarantee**

---

[13] Available at https://www.law.cornell.edu/ucc/3/3-603

Even where a guarantor of a contract has provided a broad unconditional guarantee and has waived all defenses and counterclaims, including as to the enforceability of the underlying contract, the guarantor may still avoid liability under the guarantee if the default or acceleration of repayment in the underlying contract was triggered by wrongful conduct of the beneficiary of the guarantee. See e.g., *Canterbury Realty & Equipment Corp. v. Poughkeepsie Sav. Bank*, 135 A.D. 2d 102, 524 N.Y.S. 2d 531, 533 (N.Y. App. Div. 1988)(holding that despite the language of the unconditional guarantees under which the guarantors waived any of Canterbury's defenses to the enforceability of the primary obligation, the guarantor could still challenge enforceability of the guarantee and underlying contract to the extent the beneficiary of the guarantee brought about the condition precedent on the underlying contract, i.e. default, through wrongful conduct); *Red Tulip, L.L.C. v. Neiva*, 44 A.D. 3d 204, 211-212, 842 N.Y.S.2d 1, 7 (N.Y. App. Div. 2007)(recognizing principle from *Canterbury* that if bank brought about default through wrongful conduct than the guarantee associated with the contract would not be enforceable despite the guarantors having offered an "absolute and unconditional" guarantee and having waived all defenses and counterclaims); *Renegade Tech. Group, Inc. v. Pali Capital, Inc*., 2011 Ariz. App. Unpub. LEXIS 1605 **19-20, 2011 WL 6885992 (Dec. 29, 2011)(recognizing principle from *Canterbury* that a guarantee will not be enforced if the default on the associated contract was brought about by wrongful conduct).

In *Canterbury Realty & Equipment Corp.,* Poughkeepsie Savings Bank ("Bank") provided a loan to Canterbury Realty and Equipment Corporation ("Canterbury") on February 9, 1983. 135 A.D. 2d 102, 103. As part of the loan transaction, Canterbury Industries ("CI"), the parent corporation of Canterbury, and other individuals, signed instruments under which they "irrevocably and unconditionally [guaranteed] * * * payment when due, whether by acceleration

or otherwise, of any and all liabilities of [Canterbury] to the Bank." *Id.* at 104. The guarantee also provided that "[no] invalidity, irregularity or unenforceability of all or any part of the liabilities hereby guaranteed * * * shall affect, impair or be a defense to this guaranty." *Id.* The guarantee agreement authorized the Bank to accelerate the total amount due under the loan and, without notice to Canterbury, demand payment thereof from the guarantors upon the happening of various events,  among which those relevant here were "an adverse change in the financial condition of [Canterbury], or suspension of business of [Canterbury] * * * or if the Bank deems itself insecure." *Id.* On February 2, 1984, the Bank notified Canterbury that it would no long honor Canterbury's checks and would retain all of Canterbury's future receivables. *Id.* at 105. The Bank then gave Canterbury and the guarantors written notice of default, acceleration and demand for payment of Canterbury's debt in full. *Id.* Litigation ensued, which included a motion for summary judgement by the bank against the guarantors to collect the amounts owed under the underlying contract in light of the unconditional guarantees and waiver of defenses. *Id.* at 105-106.

On appeal, the court noted "[i]n our view, Supreme Court correctly denied the Bank's motion for summary judgment on its counterclaims, despite the language of the unconditional guarantees under which the guarantors effectively waived any of Canterbury's defenses to the enforceability of the primary obligation." *Id.* at 106. The guarantors only obligated themselves unconditionally to make payments on Canterbury's liabilities "when due." *Id.* The court explained that to the extent the Bank brought about the condition precedent that allowed it to accelerate the loan repayments and the default through wrongful conduct, then the guarantors would be excused from their obligations. *Id.* at 106-108. "As Justice Holmes vividly put it in applying the principle to an analogous situation: 'If, within the time allowed for performance the

plaintiff made performance [by the primary obligor] impossible, it is unimaginable that any civilized system of law would allow it to recover [against the surety] upon the bond for a failure to perform.'" *Id.* at 107-108 (citing *Porto Rico v. Title Guaranty & Surety Co.*, 227 U.S. 382, 389 (1913)).

Here, the Guarantee Agreement did require repayment unless and until "default of the Borrower with respect to any payment when due…." See, ECF Dkt. 18-3 p. 2 (page 1 of the Guarantee Agreement). Under Section 1(b) of the Guarantee Agreement, Brenes' liability was further expressly limited notwithstanding any statement to the contrary to situations where the "Borrower fails to repay any indebtedness [owed under the July 8 Promissory Note] as result of" certain limited circumstances. None of these circumstances accounted for where BLG repeatedly tried to repay the debt but LRA acted wrongfully to prevent BLG from being able to do so. *Id.*

As in *Canterbury,* Brenes has alleged facts that would allow a reasonable trier of fact to infer that LRA intentionally and wrongfully interfered with BLG's and Brenes' ability to repay the promissory notes, by refusing to disclose the amount owed, refusing to provide information necessary for the funds to be repaid, and by demanding unreasonable and unrelated terms in a payoff letter. These wrongful actions directly caused the alleged default and accelerated repayment, i.e., that BLG arranged a line of credit with a third-party provider without fully repaying LRA. Moreover, once LRA finally disclosed the amount is was allegedly due and its wiring instructions on January 6, 2021, it demanded that get paid all accrued interest from July 28, 2020 through January 6, 2021. LRA continues to demand that any payment made any Note will be applied to interest first and all interest through the present applies.

Additionally, once LRA sought to accelerate the loan it continued to act in bad faith by claiming it was entitled to 20% interest from Brenes despite the Notes limiting LRA to 18% even

in the event of default. Additionally, as of January 6, 2021 the interest accrual on the Notes had risen to $3,591,378.47, which exceeded the $3,489,280.82 reserve BLG had requested. Further, CAL funds could only be used to payoff LRA if LRA confirmed all debts owed under the notes were paid off. Given the dispute about whether LRA should be entitled to accrued interest during the period is intentionally prevented BLG from repaying the loan would have prohibited use of CAL funds for this purpose while the dispute was ongoing.

Finally, Brenes is entitled to plead the same defenses of BLG. If the creditor sues the guarantor, the latter can plead any defense which the principal could have pleaded. See, *Carlone v. Lion & the Bull Films, Inc*., 861 F. Supp. 2d 312, 322 (S.D.N.Y. 2012); *Millgard Corp. v. E.E. Cruz/ Nab/ Frontier-Kemper*, 2002 U.S. Dist. LEXIS 23921 at *47 (S.D.N.Y. Dec.12, 2002), *summ. judg. granted*, 2003 U.S. Dist. LEXIS 20928 (S.D.N.Y. Nov. 18, 2003)(holding guarantor stands in the shoes of the principal and may assert as its own defenses to its surety obligation the principal's contractual defenses); *Nextbridge Arc Fund, LLC v. Vadodra Property*, LLC, 31 Misc. 3d 1202A, 929 N.Y.S.2d 201, 2011 WL 1124347, at * 2 (Sup. Ct. N.Y. 2011) ("Furthermore, because an individual guarantor may be viewed as standing in the shoes of the principal, such guarantor can avail only those defenses available to the principal."); *Walcott v. Clevite Corp.*, 13 NY2d 48, 55-56, 191 NE2d 894, 241 NYS2d 834 (1963)(confirming guarantor can assert defense of failure of consideration regarding the contract he guaranteed); Here, LRA has sued the principal (BLG) and the alleged guarantor together and BLG has no objection to Brenes asserting its defenses and claims. As such, Brenes has standing.

## IV.    CONCLUSION

For the forgoing reasons Plaintiff respectfully requests that the Court deny LRA's Motion for Summary Judgement as to BLG and Brenes.

Dated February 9, 2024

/s/ Troy A. Brenes
Troy A. Brenes
BRENES LAW GROUP, P.C.
100 Spectrum Center Drive, Ste. 330
Irvine, California 92618
P: 949.397.9360
tbrenes@breneslawgroup.com

DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT